Dr. Mohsen M.D. HASSAN, Plaintiff,

v.

**AUBURN UNIVERSITY, Defendant.**

Civ. A. No. 92–D–518–E.

United States District Court,
M.D. Alabama, E.D.

Aug. 11, 1993.

Richard A. Meelheim, Birmingham, AL, for plaintiff.

Thomas D. Samford, Auburn, AL, Leslie McCafferty Allen, Montgomery, AL, M.

Stanford Blanton, Birmingham, AL, for defendant.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

This cause is now before the Court for findings of fact and conclusions of law following an April 13, 1993 bench trial on Plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. As discussed below, judgment is due to be entered in favor of the Defendant.

### I. Findings of Fact

The Management Department at Auburn University, a part of Auburn's School of Business, offers four professional options: Management (MN), Human Resource Management (HRMN), Operations Management (OM), and Management Information Systems (MIS). [Testimony of Charles A. Snyder, Management Department Head, Tr. at 149]. OM focuses on the efficient manufacturing of a product or delivery of a service. [Testimony of Plaintiff, Tr. at 59]. In July, 1990, Plaintiff, an Egyptian citizen, sought employment as a faculty member in Auburn's Management Department. Plaintiff's specialty was production and manufacturing systems. [*Id.,* Tr. at 15]. In August, 1990, Auburn hired Plaintiff as a visiting professor for a nine-month term to teach certain courses in OM. [*Id.,* Tr. at 21].

Also in August, 1990, Auburn was seeking applicants for permanent positions within the Management Department. Auburn advertised the positions in the 1990 Decisions Sciences Institute Placement Service Directory. The advertisement stated a preference for candidates with experience in production/operations management, technology/innovation, and management information systems. [Testimony of Snyder, Tr. at 225]. The preference for "technology/innovation" arose from Auburn's interest in an emerging discipline within the OM division known as Management of Technology (MOT). MOT is concerned with the entire life cycle of a product or service, including "design, from concept through prototype, engineering, research and

development, production, and final finished goods delivery, [and] marketing to the consumer . . . ." [Testimony of Snyder, Tr. at 121]. Auburn's Management Department had been emphasizing a move toward MOT for some time in an effort to differentiate itself from competing business schools, and most of the faculty within Auburn's School of Business felt the emphasis was justified in order to produce graduates who could compete in a technology-oriented marketplace. [*Id.*, Tr. at 124; Testimony of Professor Loraine Gardiner, Tr. at 198].

Auburn originally hoped to fill one position with a senior OM faculty member who could assume administrative responsibility for the OM group. "Senior" applicants were those who were probably already full professors at other universities. Auburn's search committee made a list of senior applicants to be considered for the position. The ability to lead the OM group was the most important consideration in the search for the senior faculty member, while MOT expertise was preferred but not required. The search committee also made a list of more junior candidates to be considered if a senior applicant could not be hired. If Auburn were unable to hire a senior candidate with leadership abilities, the most important factor in hiring a junior candidate was experience in MOT. [Testimony of Gardiner, Tr. at 177–78; Testimony of Snyder, Tr. at 238].

In December, 1990, the OM search committee had ranked all applicants at both the senior and junior level and forwarded the rankings to Management Department Head Charles Snyder. Auburn then extended an offer of employment to two senior candidates, John Ettlie and Yash Gupta, an Indian national. Both Ettlie and Gupta had experience in MOT. Both candidates refused Auburn's offer of employment. [Testimony of Snyder, Tr. at 129–31].

The OM recruiting committee then sought authority to hire from the list of junior candidates, all of whom had experience in MOT. [March 6, 1991 memo from OM recruiting committee to Snyder, Def.Ex. 35]. This list ranked Vic Uzumeri, a Canadian citizen of Turkish descent, first among the junior candidates. [*Id.*]. Approximately 12 applicants

for the position were not named on the list because they lacked MOT experience. [Testimony of William R. Boulton, Tr. at 247]. At this point, Plaintiff was not a candidate for the position nor had he even submitted an application for the position. In fact, Professor Boulton testified that Plaintiff would not have made the list of junior faculty if he had applied because of his lack of MOT experience. [*Id.*]. However, the March 6, 1991 memo from the OM recruiting committee to Snyder recommended that Plaintiff be considered for the position. [*Id.*]. Plaintiff submitted an application on March 8, 1991, the same day the search committee met to decide which candidates to interview for the position. The search committee decided to interview Plaintiff and the first two of four candidates from the list of junior candidates, Vic Uzumeri and William Bacon. The interviews were held during the week of March 14, 1991. [Stipulations 5k and 5l].

The entire Business School Faculty met on March 18, 1991, to vote on the three candidates for the faculty position. At the time, the faculty understood that one faculty position was to be fully funded and another was partially funded. The faculty hoped to obtain additional funds to fully fund the second position so that two offers could be made. [Testimony of Gardiner, Tr. at 184–85]. At this meeting, each faculty member ranked each candidate on a six-point continuum ranging from "strongly favor hiring" to "strongly favor not hiring." After each faculty member ranked all three candidates, the order of preference was Vic Uzumeri, Plaintiff, and William Bacon. [Stipulation 5i]. Approximately 18 faculty members participated in the ranking. Only 14 of the ranking forms on Plaintiff are available. Of these 14 faculty votes concerning Plaintiff, four voted that they strongly recommended hiring him, five voted that they moderately recommended hiring him, two voted that they slightly recommended hiring him, one voted that he/she slightly recommended not hiring him, and two voted that they strongly recommended not hiring him. One of the faculty members that strongly recommended not hiring Plaintiff wrote on his ranking sheet that "I understand the students don't under-

stand him." [Plaintiff's Exhibit 9, Testimony of Plaintiff, Tr. at 29; Tr. at 210–15].

Prior to the vote, the faculty discussed the faculty's desire to continue moving toward the area of MOT [Testimony of Gardiner, at 197–98]. The faculty discussion as a whole indicated that Professor Uzumeri was best suited for the position in terms of the desired area of concentration. [Testimony of Snyder, Tr. at 145]. However, some faculty members felt that moving toward MOT was not as important as hiring a faculty member who could teach the core OM classes. One of these faculty members, Professor Amitava Mitra, the chair of the search committee and head of the OM division, felt Plaintiff was clearly the most qualified person to fill this position. [Deposition of Mitra at 11, Plaintiff's Exhibit 91].

At the March 18 faculty meeting, there was also some discussion among the faculty about Plaintiff's ability to adequately communicate to his students, though the faculty "didn't spend a lot of time on it." [Testimony of Gardiner, Tr. at 197]. Although Professor Mitra believed Plaintiff was the most qualified for the position, he conceded that there was some faculty concern about Plaintiff's ability to communicate. [Mitra Deposition, Plaintiff's Exhibit 91 at 16]. The faculty also discussed concerns about Plaintiff's student evaluation forms. Comments about Plaintiff's communications abilities and student evaluations were made solely in the context of his ability to teach. [Testimony of Snyder, Tr. at 146].

During his visiting professorship, Plaintiff taught eight classes at Auburn. While he was required to conduct student evaluations for each class, he did so for only three of the classes. These evaluations were below the department average for each of the three classes, particularly on the question of whether the instructor spoke audibly and clearly. On a scale of one to five, with one representing poor ability to speak audibly and clearly and five representing excellent ability to speak audibly and clearly, Plaintiff received scores of 2.4, 2.9, and 2.1. [Defendant's Exhibit 8; Testimony of Plaintiff, Tr. at 79–87]. Some students had previously complained to Professor Mitra about Plain-

tiff's ability to communicate. [Defendant's Exhibit 62, p. 22].

As to other qualifications, Defendant concedes that Plaintiff had more years of teaching experience that Professor Uzumeri, that Plaintiff had possessed his Ph.D. longer than Professor Uzumeri, and that Plaintiff had published more articles that Professor Uzumeri. [Stipulations, Tr. at 233–34]. However, the evidence also showed that Professor Uzumeri had superior work experience or "real world" research experience than Plaintiff. [Testimony of Snyder, Tr. at 234–36]. Most significantly, the evidence showed that Professor Uzumeri had superior qualifications in the MOT area and that his doctoral dissertation was particularly relevant to the MOT area. [Testimony of Gardiner, Tr. at 198; Testimony of Snyder, Tr. at 135–36; Testimony of Boulton at 248]. Furthermore, Professor Uzumeri was shown to possess the interest and skills to work with the Walters Center for Management of Technology at Auburn, an organization whose purpose is to provide training and conduct research in the MOT area. [Testimony of Snyder, Tr. at 148; Testimony of Uzumeri, Tr. at 270–71]. Plaintiff, on the other hand, was not even aware of the function or purpose of the Walters Center and never worked with the Center during his visiting professorship. [Testimony of Plaintiff, Tr. at 70–71]. Additionally, Plaintiff conceded that he was not qualified to teach strategic management, a course closely related to MOT, and indeed insisted that strategic management had nothing at all to do with operations management. [Testimony of Plaintiff, Tr. at 69].

Auburn offered Professor Uzumeri the fully-funded faculty position and Professor Uzumeri accepted. Because Plaintiff was the faculty's second choice' for a faculty position, Auburn offered Plaintiff the second, partially-funded position on the condition that the position received full funding. [Testimony of Gardiner, Tr. at 184–85, 194]. The second position was not funded and Plaintiff did not receive an offer of permanent employment from Auburn. When Plaintiff approached Professor Snyder to ask why Professor Uzumeri had been chosen ahead of Plaintiff, Professor Snyder told Plaintiff that the faculty

vote was private and could therefore not be attributed to one factor. However, Professor Snyder told Plaintiff that he believed Plaintiff's accent and student evaluations led some faculty members to be concerned about his ability to communicate to students. Professor Snyder conceded that he told Plaintiff that some faculty members had criticized his use of the English language at the March 18, 1991 faculty vote. [Testimony of Snyder, Tr. at 232].

Plaintiff filed a complaint with the Equal Employment Opportunity Commission alleging that he had been discriminated against because of his national origin. After receiving his "right to sue" letter, Plaintiff timely initiated this lawsuit seeking recovery under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, again alleging discrimination in an employment decision due to national origin. Following a trial held before the Court April 13–14, 1993, the matter is now before the Court for final decision and entry of judgment.

## II. Conclusions of Law

In order to establish a prima facie case of a discriminatory hiring decision, Plaintiff first must prove by a *preponderance* of the evidence:

> 1) that he or she is a member of a protected class; 2) that he or she applied for and was qualified for a job for which the employer was seeking applicants; 3) that despite his or her qualifications, he or she was rejected; and 4) that after this rejection the position remained open or was filled by a person not within the protected class.

*Welborn v. Reynolds Metals Co.*, 810 F.2d 1026, 1028 (11th Cir.1987) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). There is no question that Plaintiff, as a foreign national, is a member of a protected class, nor is it disputed that Plaintiff was rejected for the position. The fourth element of the prima facie case presents some problems. The job for which Plaintiff was rejected was offered to and accepted by another foreign national, a person who is within the same broad protected class as Plaintiff. Plaintiff, however, is an Egyptian national while the successful applicant is a Canadian national of Turkish descent. Arguably, an employer could display a discriminatory bias against certain groups of foreign nationals while holding no such bias against other groups of foreign nationals. The mere fact that the successful applicant is within the protected group of foreign nationals, therefore, does not preclude Plaintiff from establishing his prima facie case, although Plaintiff concedes that the fact that the job went to a foreign national is "strong evidence" of an absence of discriminatory intent. [Tr. at 110].

The remaining element of Plaintiff's prima facie case requires that he establish that he was qualified for the job. Defendant maintains that Plaintiff was not qualified for the job offered to Professor Uzumeri because Plaintiff completely lacked training and interest in the MOT field. While the evidence established that qualifications in MOT training were unquestionably a high priority with most of the faculty, this priority does not establish that Plaintiff was unqualified for the job. Despite his lack of MOT qualifications, Plaintiff was asked to submit his application for the job. At least one Professor believed that experience in teaching the core OM courses was more important that MOT qualifications and therefore ranked Plaintiff ahead of Professor Uzumeri. [Plaintiff's Exhibit 9, Deposition of Mitra at 11]. Another Professor stated that she ranked Plaintiff and Professor Uzumeri approximately equal in overall qualifications, though she believed Professor Uzumeri had superior qualifications in MOT. [Testimony of Gardiner, Tr. at 196]. Plaintiff was ranked second among the three candidates for the position, ahead of a candidate who had been placed on the list of junior faculty candidates because of his experience with MOT. [*Id.*, Tr. at 177–78]. Finally, Auburn offered Plaintiff a faculty position, though the offer was contingent on funds that ultimately proved to be unavailable. [*Id.*, Tr. at 194]. This evidence is sufficient to establish a prima facie case that Plaintiff was qualified for the job.

Having concluded that Plaintiff has established a prima facie case, the Court faces a strong disagreement among the par-

ties over the proper legal test to apply from this point forward. Defendant argues that in response to a prima facie case it is merely required to articulate some legitimate, non-discriminatory reason for the hiring decision, whereupon the burden shifts back to Plaintiff to prove by a preponderance of the evidence that the proffered reason is mere pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. at 1824–25. Plaintiff, conversely, correctly notes that the *McDonnell Douglas* burden shifting does not apply when a plaintiff presents *direct,* as opposed to circumstantial, evidence of discriminatory intent. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Instead, if Plaintiff has presented direct evidence of discrimination, Defendant would bear the burden of establishing by a preponderance of the evidence that Defendant would have made the same hiring decision in the absence of the illegitimate factor. *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Plaintiff contends that the statement written on one of the faculty members' ranking form and the comments made by Professor Snyder concerning Plaintiff's communication abilities constitutes direct evidence that he was discriminated against due to national origin.

The Court rejects Plaintiff's argument for two reasons. First, Plaintiff's claim that these written and oral comments constitute direct evidence of discrimination is untenable. Direct evidence of discrimination is "evidence which if believed proves the existence of a fact in issue without inference or presumption." *Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550, 1558 n. 13 (11th Cir.1988). Furthermore, "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate constitute direct evidence of discrimination." *Carter v. Miami,* 870 F.2d 578, 581–82 (11th Cir.1989). In the present case, the written and oral remarks concerning Plaintiff's accent were made in the context of his ability to communicate in a classroom, a factor that even Plaintiff concedes is a proper hiring consideration. [Testimony of Plaintiff, Tr. at 79]. *At most,* the remarks made about Plaintiff's accent or ability to communicate support an *inference*

of national origin discrimination and certainly cannot be said to present the type of direct evidence contemplated by *Castle* and *Carter.*

As a second reason for rejecting Plaintiff's proposed allocation of the burden of proof, the Court does not agree with Plaintiff that consideration of Plaintiff's accent, as it relates to his communications ability, was an illegitimate, discriminatory factor under the facts of this case. Both parties rely upon *Fragante v. City and County of Honolulu,* 888 F.2d 591, 595 (9th Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1811, 108 L.Ed.2d 942 (1990). In that case a Filipino native sought a clerk's job and placed high enough on an exam to be chosen for the job. He was nevertheless rejected "because of a perceived deficiency in relevant oral communication skills caused by his 'heavy Filipino accent.'" *Id.* at 593. The Ninth Circuit Court of Appeals found that the defendant properly rejected the plaintiff. The Court found that the plaintiff "was passed over because of the deleterious effect of his Filipino accent on his ability to communicate orally, not because he had such an accent." *Id.* at 599.

In so ruling, the Ninth Circuit set forth a standard establishing when a person's accent could be considered in an employment decision:

> An adverse employment decision may be predicated upon an individual's accent when—but only when—it interferes materially with job performance. There is nothing improper about an employer making an honest assessment of the oral communications skills of a candidate for a job when such skills are reasonably related to job performance.

*Id.* at 596–97. Plaintiff argues that this standard means that accent, or an accent's effect on communication skills, can be a factor in a hiring decision *only* if the accent is so heavy as to make a candidate completely unqualified for the position. [Tr. at 11]. This argument is completely baseless. To accept Plaintiff's argument would be equivalent to saying that an employer could consider whether a foreign national candidate was completely unable to communicate, but could not consider whether a foreign national can-

didate's ability to communicate was merely poorer than that of a competitor candidate. *Fragante* itself refutes this argument. The plaintiff in *Fragante* was a job candidate who, according to two experts, could communicate effectively in English. The Court assumed that the plaintiff was qualified for the job and that he had established a prima facie case. Notwithstanding the assumption that Plaintiff was qualified, the Court held that the employer could legitimately consider the plaintiff's communication skills in relationship to that of his competitors and that, after such consideration, the plaintiff "failed to get the job because two competitors had superior qualifications with respect to a relevant task...." *Id.* at 598.

■ Having rejected Plaintiff's contention that he has presented direct evidence of discrimination, the Court is required to apply the burden-shifting provisions of *McDonnell Douglas*. Defendant has met its burden of articulating a legitimate non-discriminatory reason for the decision by arguing that Professor Uzumeri was more qualified for the position than Plaintiff primarily because of Professor Uzumeri's MOT qualifications and Plaintiff's lack of such qualifications. Indeed, though not required to do so, Defendant has submitted convincing evidence of this non-discriminatory reason. Plaintiff therefore bears the burden of establishing that this proffered reason is a mere pretext for national origin discrimination. He has not met this burden.

■ Plaintiff essentially made little attempt to establish that Defendant's non-discriminatory reason was mere pretext. He did argue that Defendant's definition of MOT was different than his own and that, under his definition, he had superior qualifications in the technology area. While the evidence did not support this contention, and in fact completely refuted the contention, it would make little difference if the claim were true. Defendant is entitled to establish its own preferred qualifications and to define those qualifications in any way it likes. An employment decision may be based on "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, so long as it is not a discriminatory reason."

*Brown v. American Honda Motor Co.*, 939 F.2d 946, 951 (11th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992).

In this case, the evidence strongly indicated that Auburn set out from the very beginning to employ a faculty member with MOT qualifications and that Auburn had a very specific idea of what such qualifications entailed. Even Professor Gardiner, who rated Plaintiff approximately equal to Professor Uzumeri, stated that Professor Uzumeri had superior qualifications in MOT. However, even if the faculty were wrong in its preference for MOT qualifications and wrong in its interpretation of proper MOT qualifications, there is absolutely no evidence that the alleged mistakes were prompted by a discriminatory motive. Indeed, as Plaintiff concedes, the fact that the job went to another foreign national is strong evidence against this inference.

Of course, some faculty members apparently placed less importance on MOT qualifications and believed that Plaintiff was the most qualified person for the job. Similarly, some faculty members placed little or no importance on Plaintiff's comparatively poor oral communication abilities. This does not mean, however, that the Court should find that these faculty members were right and that the others were wrong. Both the MOT qualifications and the communication ability were legitimate, non-discriminatory factors that could be considered in making the hiring decision. Faculty members were entitled to disagree over the relative merits of the candidates in these areas. There was sufficient evidence from which the faculty could logically conclude that Professor Uzumeri was superior to Plaintiff in both of these areas. Plaintiff, therefore, has failed to prove that these legitimate, non-discriminatory reasons were mere pretext for discrimination.

Therefore, it is CONSIDERED, ORDERED, and ADJUDGED that judgment in this cause shall be entered in favor of Defendant Auburn University.