**Emmanuel O. MADIEBO, Plaintiff,**

v.

**DIVISION OF MEDICAID/STATE OF MISSISSIPPI, et al., Defendants.**

**No. CIV.A. 3:94–CV–382WS.**

United States District Court,
S.D. Mississippi,
Jackson Division.

July 9, 1997.

Emmanuel O. Madiebo, Jackson, MS, pro se.

Louise Harrell, Jackson, MS, for Plaintiff.

John J. Fraiser, III, Office of Atty. Gen., Jackson, MS, for Defendants.

## *MEMORANDUM OPINION AND ORDER*

WINGATE, District Judge.

This action was commenced by plaintiff Emmanuel O. Madiebo, a Nigerian national, pursuant to Title 42 U.S.C. § 2000e–2, commonly known as Title VII of the Civil Rights Act of 1964. In his amended complaint, Madiebo claims that the defendants, the Division of Medicaid/State of Mississippi and its Executive Director, Helen Wetherbee,[1] refused to promote him to the position of Medicaid Financial Program Coordinator, for which he was qualified, because of his race and national origin in violation of Title VII.[2] Defendants

---

1. In an order dated April 11, 1997, this court dismissed Helen Wetherbee as a defendant in her personal and official capacities in this lawsuit.

2. Title 42 U.S.C. § 2000e–2, commonly known as Title VII of the Civil Rights Act of 1964, states in pertinent part:

    (a) **Employer practices**

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such indi-

contest this assertion and claim that their adverse view of plaintiff's job application and interview was due to their concern, among others, whether plaintiff, who has a pronounced foreign accent, would be able to communicate effectively with the public. This case was tried to the court on March 31 through April 3, 1997, without a jury. At the conclusion of all the evidence, this court found for the defendants. The court's reasoning is set out below.

## PARTIES AND JURISDICTION

Inasmuch as Title VII constitutes the basis for plaintiff's claims, this court's jurisdictional grant is predicated upon Title 28 U.S.C. § 1331,[3] federal question jurisdiction. The plaintiff is an adult resident of the Southern District of Mississippi. The defendant Division of Medicaid is part of the Office of the Governor of the State of Mississippi.[4] The defendant Helen Wetherbee is an adult resident citizen of Hinds County, Mississippi.

## SUMMARY OF THE FACTS

The plaintiff Emmanuel O. Madiebo was born and raised in the West African Nation of Nigeria where he grew up speaking English, but nevertheless speaks with a distinct accent. About 19 years ago, in 1978, plaintiff migrated to the United States, where he attended the University of Mississippi, Oxford, Mississippi, and eventually earned an undergraduate degree in Business Administration and a Masters Degree in Public Administration. Thereafter, he attended Delta State University, Cleveland, Mississippi, where he received a Masters of Business Administration and Jackson State University, Jackson, Mississippi, where he received a Masters of Professional Accounting and a Masters of Science in Education. Additionally, plaintiff has completed 24 hours towards a Ph.D. in Public Administration, with an emphasis in Program Management at Jackson State University.

Since 1986, plaintiff has been employed by the Mississippi Department of Human Services in Jackson, Mississippi, as an Accountant/Auditor II. As an Accountant/Auditor II, plaintiff's primary duty is to conduct fiscal reviews of as many as 19 Community Action Agencies throughout the State of Mississippi. While undertaking this fiscal review, plaintiff analyzes cost reports each month and determines whether the Community Action Agencies are in compliance with federal rules and regulations, and General Accepted Accounting principles. If the Community Action Agencies are not in compliance with federal rules, plaintiff says he explains what corrective measures are expected.

In performing these job duties, plaintiff adds that he is required to interact with the various individuals who administrate the Community Action Agencies, as well as with members of the general public who receive benefits and services through these Community Action Agencies. According to plaintiff, he spends at least 30% of his time receiving incoming calls from individuals who administer the Community Action Agencies and from benefit recipients.

Plaintiff further testified that he assists with the preparation of the budget for the Division; performs special projects and trend analyses; assists in preparing state plans; and reviews the financial sections of contracts.

Plaintiff testified that during his tenure as an Accountant/Auditor II, he has received satisfactory job performance ratings and that no one has complained about his accent.

On July 2, 1993, the Division of Medicaid for the State of Mississippi published a job announcement for the position of Medicaid Financial Program Coordinator. In order to qualify for an interview for this position, an applicant needed to possess, as a minimum, a Master's degree from an accredited four-year college or university in accounting, finance,

---

" vidual's race color, religion, sex, or national origin.....

3. Title 28 U.S.C. § 1331 states:
   The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

4. Miss.Code Ann. § 43–13–107 states:
   The division of medicaid is hereby created in the office of the governor and established to administer this article and perform such duties as are prescribed by law.

banking, or business and five (5) years of experience in work related to the job being applied for; or a Bachelor's degree from an accredited four-year college or university in accounting, finance, banking or business and six (6) years of experience in work related to the position being applied for; and an evaluative SPB score of at least 70. The SPB score is a product of the applicant's education and years of work experience.

After identifying those with the requisite SPB score, the State Personnel Board compiled a list of "eligibles" to be interviewed for the vacancies in the agency. Plaintiff, having the required degree, experience and an SPB score of 100, applied for the advertised position of Financial Program Coordinator and was ultimately granted an interview on September 13, 1993.

Plaintiff was interviewed by a panel of three persons. The panel consisted of: Max Cole, Deputy Director of the Division of Medicaid, State of Mississippi; Jamie Collier, Director of Reimbursement for the Division of Medicaid, State of Mississippi; and Linda Dunson, an African–American and Personnel Director of the Division of Medicaid, State of Mississippi. These individuals were designated to conduct the interview by Helen Wetherbee, Executive Director of the Medicaid Division for the State of Mississippi, pursuant to her memorandum of June 22, 1993, wherein she stated:

Interviews and evaluations of applicants will be conducted by an Interview Panel which will consist of the following persons:

1. The first level supervisor of the position being filled.
2. The second level supervisor of the position being filled.
3. A Personnel Officer.
4. At least one of these 3 persons must be a member of a minority. If not, then a fourth person who is a member of a minority will be appointed by the Director.

While the panel was empowered to recommend an individual for the vacant position, the ultimate and final decision was to be made only by Wetherbee. Wetherbee testified that she followed the panel's recommendation.

According to plaintiff, during the interview, the panel members asked him inappropriate questions about his national origin and even laughed at his speech. When the interview was over, the panel rated plaintiff extremely low and plaintiff, consequently, was not selected for the position.

Aggrieved, plaintiff filed a complaint with the Equal Employment Opportunity Commission (hereinafter EEOC) on September 20, 1993, wherein he alleged that defendants had discriminated against him on the basis of his national origin. Upon determining that it could not finish its investigation in a timely manner, 180 days,[5] the EEOC issued plaintiff a right-to-sue letter on March 9, 1994. Thereafter, plaintiff filed an amended complaint charging defendants with race and national origin discrimination. Because plaintiff failed to raise an issue of race discrimination in his EEOC complaint, by law,

5. Title 29 C.F.R. § 1601.28(d)(2) states in pertinent part:

In all cases where the respondent is a government, governmental agency, or a political subdivision, the Commission will issue the notice of right to sue when there has been a dismissal of a charge. The notice of right to sue will be issued in accordance with section 1601.28(e). In all other cases where the respondent is a government, governmental agency, or political subdivision, the Attorney General will issue the notice of right to sue, including the following cases:

(2) Where the charging party has requested a notice of right to sue pursuant to section 1601.28(a)(1) or (2).....

Title 29 C.F.R. § 1601.28(a)(2) states:

When a person claiming to be aggrieved requests in writing, that a notice of right to sue

be issued, and the charge to which the request relates is filed against a respondent other than a government, governmental agency or political subdivision, the Commission may issue such notice as described in 1601.28(e) with copies to all parties, at any time prior to the expiration of 180 days from the date of the filing of the charge with the Commission; provided, that the District Director, Area Director, the Local Director, the Program Director, Office of Program Operations or upon delegation, the Director of Systemic Programs, Office of Program Operations of the Director, Field, Management Programs, Office of Program Operations has determined that it is probable that the Commission will be unable to complete its administrative processing of the charge within 180 days from the filing of the charge and has attached a written certificate to that effect.

plaintiff is barred from pursuing said issue at trial. *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995) (filing administrative complaint is jurisdictional prerequisite to Title VII action); *Anderson v. Lewis Rail Service Co.,* 868 F.2d 774, 775 (5th Cir.1989) (a district court may consider only those grounds of a Title VII complaint that were raised in the administrative process).

The panel of interviewers denies that plaintiff's national origin and accent had anything to do with plaintiff's rejection for the Financial Program Coordinator position. Rather, they say they did not recommend the plaintiff for employment because: (1) plaintiff had not been promoted from his present position since he was hired in 1986; (2) plaintiff had no experience with Medicaid Regulations; (3) plaintiff lacked the specific kind of audit and accounting experience that the job required; (4) plaintiff's written communication skills were poor; and (5) plaintiff's oral communication was rambling and incoherent.

The panel recommended, instead, Claire Helms, an individual who, says the panel, had better communications skills, had previously worked with the specific Medicaid regulations involved with the job position and had considerable experience with the specific kind of audit and accounting experiences that the job required. Furthermore, according to the panel, to her credit, Helms also possessed a Masters Degree in Professional Accounting from Mississippi State University in 1990, where she had maintained a 3.5 grade point average, an average higher than plaintiff's grade point average of 3 .25 in the same field of study.

Plaintiff had failed to indicate on his application that he, too, had actually graduated and received a Masters Degree in Professional Accounting. For this reason, one of the members of the interview panel, specifically Dunson, testified that she had failed to give him any credit for this degree.

All of the members of the interview panel recommended Helms, out of 12 interviewees, as their number one choice, while they differed on the number two choice. Plaintiff was not the number two choice of any of the panel members.

Comparatively speaking, the interview panel rated Helms more favorably than plaintiff in all categories except for the SPB score category. Plaintiff had a SPB score of 100, while Helms had a SPB score of 86, lower than any other applicant. However, according to Dunson, the SPB score merely identifies, as a general matter, a qualified applicant. In other words, it weeds out applicants who do not possess the minimum educational background and/or job experience. With respect to determining which applicant is the most qualified for a specific job, the SPB score has no bearing on the outcome of an applicant's interview with an agency. Rather, according to Dunson, the agency identifies the specific job requirements and rates each applicant accordingly.

In all other areas being evaluated by the panel, Helms' qualifications and/or skills were found to be superior to those of plaintiff. Specifically, with respect to accounting experience, on a scale of 0–5, with 5 being the highest score, Dunson rated Helms at 5 and plaintiff at 3; Collier rated Helms at 4 and plaintiff at 2; Cole rated them evenly at 4.

As to Degree Certification, Dunson rated plaintiff at 4 and Helms at 5; Collier rated plaintiff at 3 and Helms at 4; and Cole rated plaintiff and Helms evenly again by rating them both at 4. In Interpreting Regulations, Dunson rated plaintiff at 4 and Helms at 5; Collier rated plaintiff at 1 and Helms at 4; and Cole rated plaintiff at 3 and Helms at 4.

The panel also rated the interviewees on Teaching Speaking Skills. Under this category, Dunson rated plaintiff at 2 and Helms at 4; Collier rated plaintiff at 0 and Helms at 3; and Cole rated plaintiff at 2 while Helms received a score of 4.

The next category the interviewees were scored on was Computer Knowledge. Dunson rated plaintiff at 2 while she gave Helms a 4; Collier rated plaintiff and Helms equally at 3; Cole rated plaintiff at a 3 and Helms at a 4.

The next category was Writing Skills. Here, Dunson gave plaintiff a 3 and Helms a 4; Collier gave plaintiff a 1 and Helms a 4; and Cole gave plaintiff a 3 and Helms a 4.

The final category the interviewees were rated on was Negotiating Skills. In this

category, Dunson rated plaintiff at 2 and rated Helms at 3; Collier rated plaintiff at 1 and Helms at 3; and Cole rated plaintiff at 3 and Helms at 4.

### ANALYSIS

At issue here is whether defendants failed to hire plaintiff for the position of Financial Program Coordinator because of his national origin. If defendants' adverse view of plaintiff's job application was based upon plaintiff's national origin in violation of Title VII, plaintiff is entitled to compensatory relief in addition to various equitable remedies, including, but not limited to, employment. Title 42 U.S.C. § 2000e–5(g)(1).

Title 42 U.S.C. § 2000e–2, commonly known as Title VII, prohibits employment discrimination on the basis of national origin. The specific pertinent wording of Title VII is as follows:

(a) Employer Practices

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color religion, sex or national origin.

Often confused with race, national origin has been defined by the United States Supreme Court to mean "the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Ang v. Procter & Gamble Company,* 932 F.2d 540, 546 (6th Cir.1991) (quoting *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 88, 94 S.Ct. 334, 336, 38 L.Ed.2d 287 (1973)). So then, as noted by the Court in *Roach v. Dresser Indus. Valve & Instrument Division,* 494 F.Supp. 215, 216 (W.D.La.1980), "a person's national origin has nothing to do with color, religion or race."

■ However, national origin is deemed to be inextricably intertwined with an individual's accent. *Fragante v. City & County of Honolulu,* 888 F.2d 591 (9th Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1811, 108 L.Ed.2d 942 (1990). Therefore, an individual who is discriminated against because of the characteristics of his speech has a cause of action pursuant to the prohibition of national origin discrimination in Title VII. *Id.*

■ As in any discrimination case, a plaintiff complaining of discrimination on the basis of national origin bears the ultimate burden of proving, by a preponderance of the evidence, that his employment was adversely affected by his protected class status. *Surti v. G.D. Searle & Co.,* 935 F.Supp. 980, 984 (N.D.Ill.1996) (case involving national origin). This burden can be met by presenting direct evidence or, in the absence of direct evidence, plaintiff may prove his case with indirect or circumstantial evidence. *Id.* Proving one's case with circumstantial evidence involves the burden-shifting process articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). A Title VII plaintiff must first show the following: (a) he is in a protected class; (b) he is qualified; (c) he suffered an adverse employment action; (d) similarly situated employees who are not in a protected class were treated more favorably. The burden then shifts to defendant who must articulate a legitimate non-discriminatory reason for its actions. If defendant is successful, the burden shifts back to plaintiff who must show that the proffered reason is a pretext for discrimination.

During the course of the trial, plaintiff and defendants presented diametrically-opposed testimony as to what occurred during the interview. Plaintiff's version is that no questions were asked of him about his educational or professional background. Instead, says plaintiff, he was only asked where he was from and that at least one interviewer laughed openly at his manner of speaking. Defendants have denied plaintiff's assertion. Defendants claim that while the information about plaintiff's national origin did come out at the interview, it was merely small talk motivated only by the panel members' desire to relax plaintiff who appeared to be nervous.

In determining which party has offered the most credible version of the facts, this court must consider the demeanor of the witnesses, their interests in the case, the internal consistency of their testimony and the impeachment factor owing to contradictory evidence.

*Justiss Oil Co., Inc. v. Kerr–McGee Refining Corp.,* 75 F.3d 1057, 1067 (5th Cir.1996) ("In a nonjury trial, credibility choices and the resolution of conflicting testimony remain the province of the judge . . . ."); *Reich v. Lancaster,* 55 F.3d 1034, 1035 (5th Cir.1995) ("The trial judge's 'unique perspective to evaluate the witness and to consider the entire context of the evidence must be respected.' "); *Louis v. Blackburn,* 630 F.2d 1105, 1109 (5th Cir.1980) ("One of the most important principles in our judicial system is the deference given other finders of fact who hear the live testimony of witnesses because of their opportunity to judge the credibility of those witnesses."); Fed.R.Civ.P. 52(a) (". . . due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.")

Having carefully weighed plaintiff's and defendants' evidence presented at trial, the court finds the defendants' version of the facts more credible. Accordingly, this court credits defendants' testimony that plaintiff was not selected for the Financial Program Coordinator position because: (1) plaintiff had not been promoted from his present position since he was hired in 1986; (2) plaintiff had no experience with Medicaid Regulations; (3) plaintiff lacked the specific kind of audit and accounting experience that the job required; (4) plaintiff's written communication skills were poor; and (5) plaintiff's oral communication skills needed improvement.

Plaintiff argues, however, that if defendants took into consideration plaintiff's oral communication skills, they are essentially attacking his accent which is inextricably intertwined with his national origin and, therefore, is violative of Title VII. This court is not persuaded by plaintiff's argument.

■ In the context of national origin discrimination, unlawful discrimination does not occur when a plaintiff's manner of speaking or "accent affects his ability to perform his job effectively." *Ang,* 932 F.2d at 546, citing *Fragante,* 888 F.2d at 597.

An adverse employment decision may be predicated upon an individual's accent when—but only when—it interferes materially with job performance. There is nothing improper about an employer making an honest assessment of the oral com-

munications skills of a candidate for a job when such skills are reasonably related to job performance.

*Also see Fragante,* 888 F.2d at 596–597. *Hassan v. Auburn University,* 833 F.Supp. 866, 871 (M.D.Ala.1993). Because the evaluation of a person's communication skills is an inherently subjective determination, *Surti,* 935 F.Supp. at 986, district courts are encouraged to give such claims a very searching look so as to identify whether a claim that plaintiff lacked communications skills is not just an attempt to refuge national origin discrimination. *Fragante,* 888 F.2d at 596. Thus, if the claim by defendant that plaintiff's communication skills are inadequate is just a code for references to his accent, such a claim may not qualify as a legitimate nondiscriminatory reason, *Surti,* 935 F.Supp. at 987, since "an individual has the . . . linguistic characteristics of a national group." Title 29 C.F.R. § 1606.

■ At trial, the court paid careful attention to plaintiff's manner of speaking. He has a noticeably, thick accent. He has difficulty with some words, as he syllabifies them differently than is accepted as customary American speech. During trial, when plaintiff was on cross-examination, defense counsel repeatedly sought to show this point by asking plaintiff to say various words, for instance, "develop," a word plaintiff articulates with an unconventional stress on the syllables.

While, for the most part, the court was able to understand plaintiff's speech pattern, it was obvious to the court that plaintiff was taking great pains to speak in a slow, deliberate manner. This causes the court to wonder how plaintiff sounds outside the courtroom when he is not tasked with showing his communication skills on the witness stand. Since the court had the benefit of being able to observe the plaintiff's lips as he spoke, the court also wonders whether the court, or another, would be able to understand plaintiff in a telephone conversation.

The incident giving rise to this case occurred more than 3 years ago. Now, after the passage of all this time, this court is being asked to assess plaintiff's speaking pattern at that time. Plaintiff, who has the

ultimate burden of persuasion, did not present any evidence, other than his own self-serving testimony, that the manner in which he spoke at trial was essentially the same as he had spoken three years ago during the interview. He could have called co-workers to testify on this point, or even neighbors and friends. He called no one. This court would expect that after filing this type of lawsuit, a plaintiff might try to improve the quality of his speech. Further, the court appreciates that just the passage of time might help the diction of a plaintiff who is constantly exposed to the demands of the English language. Dunson testified that plaintiff's manner of speaking during trial had indeed improved from the time when he had interviewed for the Financial Program Coordinator position more than three years ago.

The position of Financial Program Coordinator is characterized by the Medicaid Division as advanced professional work in the analysis of cost data and in the establishment of reimbursement rates for long term health care providers participating in the medicaid program. A person assuming this position is responsible for analyzing cost data filed by long term health care providers; reviewing results of filed audits to monitor fiscal compliance with rules and regulations of the medicaid program, providing technical and professional assistance to long term health care providers; and compiling various statistical reports. Furthermore, according to the members of the interview panel, besides possessing the ability to perform the technical aspects of the Financial Program Coordinator position, an applicant must also demonstrate an ability to pay attention to detail and to communicate effectively with others. Clearly, if an individual speaks in a manner that lacks the proper enunciation or pronunciation of words, that individual is not the best candidate for a position which requires more. Each member of the evaluation team reflected his/her dissatisfaction with plaintiff's speech pattern. The plaintiff has simply not presented the court with any persuasive evidence that plaintiff was discriminated against on account of his accent. Thus, this court finds that plaintiff, who has the burden of proof, simply has not shown that he was discriminated against because of his national origin.