**ORDERED** that the motion to dismiss pursuant to Fed.R.Civ.P. 12(c) filed by claimant, Bernard Wray, is **DENIED**; and it is further

**ORDERED** that, in the event the United States prevails under 31 U.S.C. §§ 5316 and 5332, the amount forfeited shall be limited to $7,500.

**Reza SALAMI, Plaintiff,**

v.

**NORTH CAROLINA AGRICULTURAL & TECHNICAL STATE UNIVERSITY, Defendant.**

**No. 1:03CV00909.**

United States District Court, M.D. North Carolina.

April 13, 2005.

Thomas Keith Black, Greensboro, NC, for Plaintiff.

Kimberly D. Potter, Raleigh, NC, for Defendant.

## MEMORANDUM OPINION

BEATY, District Judge.

This matter comes before this Court pursuant to Defendant's Motion for Summary Judgment [Document # 42]. Plaintiff Reza Salami ("Plaintiff" or "Mr. Salami") filed suit in this case against Defendant North Carolina Agricultural & Technical State University ("A & T" or "Defendant"), alleging discrimination in employment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, on the bases of national origin, religion, and retaliation. Specifically, Plaintiff claims that he was removed from the position of Associate Dean for the College of Engineering because of his Iranian national origin and Muslim religion, and that Defendant then retaliated against him for filing charges with the Equal Employment Opportunity Commission ("EEOC") by, among other things, failing to disburse funds due to him and failing to approve his research proposal. In conjunction with Defendant's Motion for Summary Judgment, Defendant has also filed a Motion to Strike [Document # 65] a number of Plaintiff's supporting affidavits. Additionally, Plaintiff has filed a Motion to Exclude Defendant's Expert Report [Document # 40] and Defendant has filed a Motion to deem that same expert report timely filed [Document # 38].

## I. FACTUAL HISTORY

As is appropriate on a Motion for Summary Judgment, the facts are presented in the light most favorable to Plaintiff based on the evidence before the Court. Since 1987, Plaintiff has been employed by Defendant, starting as an assistant professor within Defendant's College of Engineering, and eventually becoming a full professor. During those years, Plaintiff received generally good performance evaluations and brought in approximately $1.15 million in research proposal funds. The funds brought in by Plaintiff fueled more than ten research proposals, all of which were approved and endorsed by Defendant.

In July 1998, Plaintiff was appointed Associate Dean of the College of Engineering by Lonnie Sharpe, Jr. ("Sharpe"), then Dean of the College of Engineering (the "COE"). Plaintiff was appointed to this position for a "12–month period." (Aff. Salami ¶ 10.) This position increased Plaintiff's monthly salary by twenty percent, gave him twelve months pay instead of nine months pay, increased his employee benefits, and was a promotion to a higher level employment position. Plaintiff continued to work under Sharpe as Associate Dean for the next several years without incident and with favorable employee evaluations. In July 2000, Sharpe was replaced as Dean of COE by Joseph Monroe ("Monroe").

Soon after Monroe became Dean, he and Plaintiff met to discuss Plaintiff's job status. During that meeting, Dean Monroe told Plaintiff that Plaintiff would be his "deputy dean." (Aff. Salami ¶ 14.) Under Dean Monroe, Plaintiff was responsible for overseeing part of the COE's periodic accreditation review by the Accreditation Board for Engineering and Technology ("ABET"). In June 2001, Plaintiff received a letter from Dean Monroe stating that the administrative structure of the COE would remain intact. In October 2001, Plaintiff received a letter from A & T's Provost Carolyn Meyers ("Meyers") thanking him for his work on the ABET accreditation.

Under Dean Monroe, Plaintiff was also responsible for managing federal Title III grants, which included monitoring and reporting to Dean Monroe the status of the funds for the COE's graduate students.

Plaintiff would report his grant management activity to Dean Monroe, who would then in turn report to Kenneth Murray ("Dr.Murray"), the Title III director for A & T's graduate schools, who had taken over the position from Thoyd Melton. Under Melton, Salami experienced no negative criticism as to his managing expenditures of Title III grant money. However, under Dr. Murray, Plaintiff was accused of mismanaging the Title III budget, even though all changes that Plaintiff made to the Title III budget were approved by both Dean Monroe and Dr. Murray, himself.

Plaintiff attributes Dr. Murray's negative attitude towards him to racism, on the basis of comments Dr. Murray made to him and to others. In 1995, when Plaintiff first became eligible to become a full professor, Dr. Murray, as then-interim Dean of the COE, rejected his application. The next year, when Plaintiff again applied for tenure, Dr. Murray again rejected the application. However, that year A & T had a neutral individual review Plaintiff's application, and Plaintiff was awarded the position of full professor on July 1, 1997. Additionally, Plaintiff alleges that Dr. Murray told him that, "A & T is first for blacks, then for whites, and then for you." (Aff. Salami ¶ 8.) Dr. Murray also openly remarked to Sharon Waldrum ("Waldrum") at her job interview that Plaintiff did not have the work ethic of most Iranians and that he did not work as hard as Chinese faculty. (Aff. Waldrum ¶ 5.)

In or about August 2001, Plaintiff learned that the Department of Education would conduct a site audit of A & T's administration of the Title III program. Dr. Murray then expressed concern to Plaintiff and Dean Monroe about the budget changes that he, Dr. Murray, had previously approved. Dr. Murray asked Plaintiff and Dean Monroe to prepare a report to explain the budget changes. Plaintiff prepared the report, which Dean Monroe approved without incident. Dr. Murray, however, was not satisfied with the report, called it "worthless" and told them to do it over. Allegedly, Dr. Murray repeatedly questioned Plaintiff's performance within the Title III program in front of Dean Monroe. Dr. Murray then had Plaintiff removed from administering the Title III program. Dr. Murray himself was later removed from managing the Title III money, after the Title III report from the Department of Education came out, asking that Dr. Murray be removed.

On November 28, 2001, Plaintiff received a renewal letter from Chancellor James Renick, which informed him that he would be employed as Associate Dean during the 2001–2002 school year for a "contract period" of twelve months. On December 7, 2001, Plaintiff met with Dean Monroe to discuss his job performance. Dean Monroe allegedly told Plaintiff that he was doing excellent work as Associate Dean, and had no negative comments regarding his performance. (Aff. Salami ¶ 25.)

Less than a week later, on December 12, 2001, Dean Monroe again met with Plaintiff. This time, Dean Monroe gave Plaintiff an undated letter informing Plaintiff of his demotion from the position of associate dean, effective January 1, 2002. This letter attributed Plaintiff's demotion to a reorganization of the Dean's staff and thanked Plaintiff for his diligent services. During this December 12 meeting, Dean Monroe also allegedly told Plaintiff that the main reason for his demotion was the fact that Dr. Murray could no longer bear to work with him. (Aff. Salami ¶ 27.) Plaintiff was not told that his demotion was due to incompetence, unsatisfactory performance, neglect of duty, or misconduct, as is required by Defendant's personnel policies in order to terminate him "for

cause." As a result of his demotion, Plaintiff lost salary, employee benefits, and professional reputation. Plaintiff was replaced as Associate Dean by Sanjiv Sarin ("Sarin"), whose national origin is Indian and religion is Hindu.

Around the same time that Plaintiff was demoted, Dean Monroe also terminated three other Iranian–Muslims from their employment: Ashghar Googerdy, Bahram Zargham, and Johanghi Emrani.[1] These terminations occurred in the year after September 11, 2001, a time when national sentiment for Arabians and Muslims was particularly negative.

In response to his demotion, Plaintiff filed an EEOC charge against Defendant on May 2, 2002. Subsequently, all work on Graham room # 10, a building that Plaintiff used for his research, was stopped, and the money that was to be dispersed for the renovations has not been disbursed. As a result, several pieces of equipment that Plaintiff needed for his research have not been installed. Additionally, by letter dated November 29, 2004, Associate Dean Sarin wrote to Plaintiff to tell him that all of Plaintiff's research space, including Graham room # 10, would be taken away in January 2005 because Plaintiff allegedly failed to complete a form regarding his space needs. Plaintiff states that he completed the forms in September and November 2004 and gave them to his direct supervisor Peter Rojeski ("Rojeski"). Plaintiff contends that these acts took place as retaliation for Plaintiff filing his second EEOC charge, alleging retaliation, on October 31, 2002.

Additionally, Plaintiff alleges that prior to his first EEOC charge, he had established the Civil Infrastructure Research Institute ("CIRI"), a research entity aimed at coupling student and professor research together, with the full aid and support of A & T. Plaintiff alleges that Dean Monroe approved his submission to Earnestine Psalmonds ("Psalmonds"), Defendant's Vice Chancellor of Research, to establish the CIRI as an official "center" within A & T on or about April 2, 2001. The CIRI was subsequently listed on Defendant's website as an official "center" at A & T. Additionally, on February 19, 2002, about three months before Plaintiff filed his EEOC charge, Dr. Psalmonds approved an unrestricted account for holding CIRI's money and deposited $25,000 in the account.

However, after Plaintiff filed his EEOC charge, Dean Monroe sent him a letter, as did university counsel, instructing him to "cease and desist" all use of the CIRI name in conjunction with the university. Plaintiff alleges that because many of his research proposals were filed in CIRI's name, Defendant's order to cease and desist had the effect of forcing him to stop his research activities, thereby denying him additional salary and professional opportunity.

Additionally, Plaintiff alleges that after he filed his first EEOC charge, Defendant's employees Dean Monroe, Associate Dean Sarin, and Dr. Rojeski further retaliated against him by failing to timely approve his research proposal that sought funding from the Federal Aviation Administration ("FAA") regarding a project to take place at Piedmont Triad International

---

**1.** Mr. Googerdy was terminated during the summer of 2002. Mr. Zargham was terminated on August 29, 2002. Plaintiff does not state exactly when Mr. Emrani was terminated, nor has Mr. Emrani filed an affidavit in this case. However, Plaintiff alleges that Mr. Emrani was terminated during "the same time period, just after September 11, 2001." (Aff.Salami, ¶ 29.) Dean Monroe's Rebuttal Affidavit states that Mr. Emrani was terminated at the end of the 2001–2002 academic year. (Rebut. Aff. Monroe, at 10.)

Airport ("PTIA"), submitted in December 2003 (the "PTIA Proposal"). Prior to his first EEOC charge, Plaintiff alleges that Defendant's approval of research proposals was a mere formality with very few questions being asked of him, as the researcher, and approval occurring within a few days of submission. After the EEOC charge, Dr. Rojeski sent a letter to Plaintiff dated December 29, 2003 that contained ten issues he had with the proposal, including the valuation of software that would be provided by a software company, questions regarding the support of PTIA for the proposal, questions regarding certain technical aspects of the proposal, and questions about CIRI's authority to submit the proposal. Plaintiff alleges that these questions were not commonly asked by this group of administrators, but instead were asked, if at all, by A & T's Division of Research. In fact, Plaintiff alleges that it is not common practice for the COE administration to question the value of matching funds or the technical aspects of a proposal.

After Plaintiff delivered a letter of support from Ted Johnson ("Mr.Johnson"), Executive Director of PTIA, and a letter from the software company showing an itemized accounting of the software's value, COE's administration continued to refuse to approve the proposal. Plaintiff alleges that COE administration did not accept the letter from Mr. Johnson as clear support for the proposal, nor did they consider the numbers provided by the software company as accurate. As of May 2004, because the proposal still had not been approved, Plaintiff stopped work on the project and as an effect, lost research money and professional opportunity.

Plaintiff cites one other incidence of alleged retaliation by Defendant. In late 2002, Dr. Psalmonds asked Plaintiff to go to Caterpillar, Inc. ("Caterpillar") head-quarters in Peoria, Illinois to assess the feasibility of receiving patent rights from Caterpillar on certain water dredge technology, and to ask for at least $50,000 to help maintain those patent rights (the "Caterpiller Project"). Dr. Psalmonds and Plaintiff allegedly agreed that if Plaintiff could get more money from Caterpillar, the university would match the funds and approve the Caterpillar proposal. Plaintiff subsequently negotiated a $200,000 grant for patent maintenance and the furtherance of the Caterpillar Proposal. Dr. Psalmonds then allegedly agreed that the university would pay $300,000 in matching funds. On February 27, 2003, A & T and Caterpillar entered into a "Technology Donation Agreement" in which A & T agreed to develop the patents for commercial application.

However, since this agreement was entered into, Plaintiff alleges that A & T has refused to fully authorize the Caterpillar Proposal and provide the additional funds for its furtherance. Provost Meyers agreed in a letter that Plaintiff would receive the remainder of the Caterpillar funds after the costs of patent maintenance were paid. In the summer of 2003, Dr. Psalmonds provided Plaintiff with $30,000 of the funds to do certain tasks related to the Caterpillar Proposal, including initial communications with federal and state agencies, literature reviews, and on-site research. However, Defendant did not permit Plaintiff access to the patents themselves. Neither Plaintiff nor CIRI has received any more funding from this proposal, and university administrators have refused to give Plaintiff a clear answer as to the status of the Caterpillar funds.

Defendant disputes many of Plaintiff's allegations, and states that Dean Monroe had several nondiscriminatory reasons to demote Plaintiff. Defendant states that

Dean Monroe wanted to reorganize the COE, and because Plaintiff was an at-will employee, Defendant could demote Plaintiff without cause. Also, Defendant states that Dean Monroe noticed deficiencies in Plaintiff's performance, particularly relating to the administration of the Title III grants, the ABET accreditation, and Plaintiff's relationship with colleagues. Furthermore, Defendant denies retaliating against Plaintiff in any form, including by taking away research space, holding up his PTIA Proposal, or denying him money from the Caterpillar Proposal that Plaintiff was promised.

Defendant moves for summary judgment as to all of the claims. Defendant also contends that the scope of Plaintiff's retaliation claims should be limited to the claims properly presented in Plaintiff's second EEOC Charge 145A300053, filed on October 31, 2002. The Court will consider each of these contentions in turn, but will first consider Defendant's Motion to Strike Plaintiff's affidavits and the issue of whether the expert report will be deemed timely served.

## II. MOTIONS TO STRIKE

Defendant argues that many parts of different affidavits submitted by Plaintiff are inadmissible for a number of reasons, including hearsay and other incompetent evidence. Under Rule 56(e) of the Federal Rules of Civil Procedure, "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." But before discussing those specific objections to parts of the affidavits, this Court will turn to Defendant's arguments to entirely exclude three affidavits based on Plaintiff's failure to disclose these individuals during discovery.

■ Defendant argues that the affidavits of Ted Johnson [Document # 58], Sharon Waldrum [Document # 64], and Reginald Whitsett [Document # 63] should be stricken on the grounds that Plaintiff failed to disclose these individuals in particularity in his Initial Disclosures or his Supplemental Disclosures. Under Rule 26(a)(1)(A), a party must disclose the "name and, if known, address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information." Failure to so disclose can result in the court denying the party's use of that evidence at trial. Fed.R.Civ.P. 37(c)(1).

Plaintiff states that as to affiant Ted Johnson, Plaintiff included in his Supplemental Disclosures the statement that "all pertinent individuals referenced in any discovery document or deposition" could be potential witnesses. Plaintiff further notes that during Plaintiff's deposition, Defendant's counsel questioned Plaintiff at length about the level of support given by, and the involvement of, Mr. Johnson with regards to the FAA Proposal, and even admitted into evidence the letter Mr. Johnson provided to Plaintiff regarding PTIA's support of the proposal. Despite Defendant's objection, the Court now finds that Mr. Johnson was sufficiently disclosed to Defendant, and Defendant cannot now credibly argue that it is surprised to find Mr. Johnson's affidavit as part of Plaintiff's case-in-chief. Therefore, Defendant's Motion to Strike the Affidavit of Ted Johnson, on this basis, is denied.

Plaintiff argues that affiant Reginald Whitsett ("Whitsett") did not need to be disclosed in his Initial or Supplemental Disclosures, because Mr. Whitsett's testimony is for the purpose of impeachment of Kenneth Murray. Under Rule 26(a), indi-

viduals whose testimony is only for impeachment purposes need not be disclosed. Mr. Whitsett's affidavit provides testimony as to his alleged interactions with Dr. Murray, in that Mr. Whitsett alleges that Dr. Murray refuses to address him when Mr. Whitsett speaks to him and that he will often ignore Mr. Whitsett. Mr. Whitsett further states that he bases his belief that Dr. Murray has a racial prejudice against non-Caucasian individuals on conversations Mr. Whitsett has had with four other individuals. Defendant argues that Mr. Whitsett's affidavit is not offered for impeachment purposes "as none of Whitsett's testimony relates to plaintiff or to any of the decision makers on plaintiff's employment at NCA & T." The Court now finds that to the extent that Plaintiff alleges that Dr. Murray's opinion of Plaintiff had an impact on Dean Monroe's decision to demote Plaintiff, Mr. Whitsett's testimony may be used to impeach Dr. Murray if he denies a racial prejudice against non-Caucasians. As such, Defendant's Motion to Strike the Affidavit of Reginald Whitsett on this basis is denied.

While Defendant also includes the affidavit of Sharon Waldrum among those it wishes to strike based on Plaintiff's failure to disclose her name in his Initial or Supplemental disclosures, Defendant also states that "because Waldrum was, however, identified as a potential witness in plaintiff's discovery responses dated April 30, 2004, ... defendant is willing to waive its objection herein as to Waldrum alone, as defendant was not denied the opportunity to engage in discovery regarding

Waldrum, had it so wished." (Def.'s Mem. Supp. Mot. Strike, at 2.) As such, the Court finds that this is not a reason to strike Ms. Waldrum's affidavit.

■ Defendant argues, however, that portions of Ms. Waldrum's affidavit, as well as portions of the affidavits of Bejshad Baseghi, Sherry Bittle, Ashgar Googerdy, Ted Johnson, Reginald Whitsett, Bahram Zargham, and Plaintiff should be stricken for a number of other reasons, including hearsay, speculation, conclusory opinion, and improper legal conclusions. The Court will now discuss the legal standards applying to the affidavits, in order to properly explain the Court's reasoning as to why all of Defendant's objections will be summarily denied.

■ First, a statement is admissible hearsay if it is an admission by a party-opponent. Such a statement is one that is "offered against a party and is ... (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, ...." Fed.R.Evid. 801(d)(2)(D)(2004). Under this clause of Rule 801, "independent evidence establishing the existence of the agency must be adduced, but specific authorization to speak need not be shown." *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 321 (4th Cir.1982).[2] Indeed, the only showing necessary is that the statement is made within the scope of the agency. *Id.* In *Portsmouth Paving*, the Fourth Circuit Court of Appeals found that a statement made by a secretary over

---

**2.** Indeed, Defendant misstates this rule in its Motion to Strike, stating as to Rule 801(d)(2)(D) that, "Typically, however, any admissions damaging to an employer by an employee (such as the alleged statement by Dr. Murray in this case) are inadmissible under this section of the Rule, on the ground that the employee would not be 'authorized'

to make such statements." (*Def. Mot. Strike*, at 6.) That statement is correct under Rule 801(d)(2)(C), as stated in *Portsmouth Paving*, but it is not correct as to Rule 801(d)(2)(D). *Portsmouth Paving*, 694 F.2d at 321 ("Clause (D) broadens the narrower 'orthodox rule embodied in clause (C).' ")

the phone was within the scope of her agency because part of her job was to relay messages from her boss to business callers. *Id.* at 322 In contrast to *Portsmouth Paving*, in *Staheli v. University of Mississippi*, 854 F.2d 121 (5th Cir.1988), the court found that a statement was outside the scope of a professor's agency. In *Staheli*, a university professor brought suit against his university when he was denied tenure. There, the court held that a statement made to plaintiff by another professor about the University Chancellor's opinion of plaintiff was not within the commenting professor's agency, and therefore not an admission of a party opponent, because that commenting professor had nothing to do with the tenure decision as to plaintiff. *Id.* at 127 ("Therefore, his statement did not concern a matter within the scope of his agency and was made in his capacity as wiseacre only."). However, significant involvement, either as an advisor or participant, can establish that a statement is made within the scope of an employee's agency, even if that employee is not the final decision-maker. *EEOC v. Watergate at Landmark Condominium*, 24 F.3d 635, 640 (4th Cir.1994)(finding that statements by two individuals with heavy influence over the ultimate decision-maker were admissible under Rule 801(d)(2)(D)).

Plaintiff has alleged that Dean Monroe told him that a major part of Dean Monroe's decision to demote Plaintiff was based on Dr. Murray's dislike of Plaintiff. As such, and unlike *Staheli* where the commenting professor had no impact over the plaintiff's tenure decision, the Court finds that because of this allegation, that Dr. Murray heavily influenced Dean Monroe's decision to demote Plaintiff, any statement Dr. Murray made as to his opinion of Plaintiff would be within the scope of his agency, and as such, is admissible hearsay. Similarly, any statement Dean Monroe made, as the decision-maker to demote Plaintiff, is admissible hearsay under Rule 801(d)(2)(D).

Defendant also attacks a number of statements in the affidavits as beyond the first-hand knowledge of the affiant. In the absence of an affirmative showing of personal knowledge of specific facts, a court cannot consider those facts in determining a summary judgment motion. *See Antonio v. Barnes*, 464 F.2d 584, 585 (4th Cir. 1972). However, the Court will evaluate Defendant's motions to strike while considering that "the papers of a party opposing summary judgment are usually held to a less exacting standard than those of the moving party." *See Grey v. Potter*, No. 1:00CV00964, 2003 WL 1923733, at *4 (M.D.N.C. April 21, 2003)(other citations omitted). Therefore, although the Court will not address each specific statement Defendant objects to, to the extent that this Court conclusively finds that any statement is not based on an affiant's first-hand knowledge, the Court will disregard that statement in making the summary judgment determination. Defendant also attacks a number of Plaintiff's affiants for espousing conclusory opinions. Likewise, to the extent that this Court conclusively finds that any statement is conclusory, it will disregard that statement in the summary judgment analysis.

Additionally, Defendant moves to strike a number of statements by affiants that consider Plaintiff's abilities as an employee. The Court will not strike these statements, but will give them their proper weight, as per *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir.1998)(holding that fact that employee's coworkers thought plaintiff did a good job is "close to irrelevant"). The Court will treat similarly Plaintiff's self assessment as an employee. *See Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir.1996)(stating that it is the perception

of the decision-maker that is relevant, not the self-assessment by the employee). The Court will now consider the status of Plaintiff's affidavits after announcing these general rules.

### A. Affidavit of Bejshad Baseghi ("Baseghi")

Most of Defendant's objections to the affidavit of Bejshad Baseghi are that he could have no personal knowledge of A & T's procedures for approving research, because he did not work at A & T. However, Baseghi did work with Plaintiff on his PTIA proposal at A & T, and states that he has pursued numerous other grants in his research career. As such, the Court cannot determine at this time whether Baseghi has first-hand knowledge of all that he claims, but the Court cannot state that he does not have general knowledge of the research grant process and A & T's deviations therefrom, simply because he does not work for Defendant as Defendant argues. Therefore, Defendant's Motion to strike the affidavit of Baseghi is denied.

### B. Affidavit of Sherry Bittle ("Bittle")

Similarly, Defendant objects to the affidavit of Sherry Bittle based on conclusory allegations and lack of personal knowledge. However, Ms. Bittle works as an administrative assistant for Defendant and states that she had observed Plaintiff working on the Caterpillar Proposal and that she saw a number of Iranians lose their jobs with Defendant. The Court cannot conclusively say that these observations are not within Ms. Bittle's personal knowledge. Therefore, Defendant's Motion to Strike the affidavit of Ms. Bittle is denied.

### C. Affidavit of Ashgar Googerdy ("Googerdy")

Defendant objects to the affidavit of Ashgar Googerdy, and in particular to a document allegedly from Dean Monroe to Mr. Googerdy offering him a four-year employment contract. Defendant asserts that this letter is hearsay and was forged. Defendant further asserts that any comments by Dean Monroe or the Chancellor to Mr. Googerdy must be hearsay.

Plaintiff argues in response that the document allegedly from Dean Monroe to Mr. Googerdy is a contract, and therefore is not hearsay. In addition, Plaintiff asserts that Dean Monroe's statement that he did not author the letter as opposed to Mr. Googerdy's assertions that he did is an issue of fact for a jury to decide and does not preclude the admission of the evidence.

The Court now finds that because the letter consists of an admission of a party opponent, Dean Monroe, it is unnecessary to determine whether Plaintiff is correct in stating that the document falls outside of the hearsay rule based on its alleged status as a contract. Additionally, while it is true that unauthenticated evidence may not be used in deciding a summary judgment motion, this Court presumes that during a trial Plaintiff will be able to offer evidence to the effect that the signature on the document is Dean Monroe's signature. At that point, Defendant can contest the signature's authenticity. However, as for this motion for summary judgment, the Court does not find conclusive evidence that the documents in question are forgeries, or for that matter, that they are not authenticated. Therefore, the Court finds that Defendant's objections to Mr. Googerdy's affidavit and its accompanying exhibit are without merit and are better left to be resolved during trial. As such, Defendant's Motion to Strike the affidavit of Mr. Googerdy is denied.

### D. Affidavit of Ted Johnson

Defendant objects to Mr. Johnson's affidavit based on hearsay as to what Plaintiff

may have discussed with affiant and Mr. Johnson's lack of first-hand knowledge of what A & T did with Plaintiff's PTIA Proposal. Plaintiff argues that the contents of the conversation between Mr. Johnson and Plaintiff are not being offered for the truth of the matter asserted, but to show that Plaintiff and Mr. Johnson had discussions regarding the PTIA Proposal and Mr. Johnson was aware of the proposal. The Court finds that what Plaintiff may have discussed with Mr. Johnson is not being offered for the truth of the matter asserted. As such, it is admissible. Plaintiff further argues that Mr. Johnson's statement is that, to his knowledge, A & T has not approved the proposal. This would not be outside Mr. Johnson's first-hand knowledge as director of PTIA. Therefore, Defendant's Motion to Strike the Affidavit of Mr. Johnson is denied.

### E. Affidavit of Sharon Waldrum ("Waldrum")

Defendant objects to the affidavit of Sharon Waldrum based on her testimony as to what Dr. Murray had said to her regarding Plaintiff and Chinese individuals. Defendant further objects based on a lack of Ms. Waldrum's first-hand knowledge as to the research proposal process. Plaintiff argues that as an assistant to Dr. Chang, Ms. Waldrum does have first-hand knowledge of the research proposal process and can speak to how it occurred in her experience. As this Court has previously determined that Plaintiff has alleged that Dr. Murray influenced Dean Monroe's decision to demote Plaintiff, statements by Dr. Murray are admissions of a party opponent, and as such are admissible hearsay. Therefore, Defendant's Motion to Strike the affidavit of Ms. Waldrum is denied.

### F. Affidavit of Reginald Whitsett

Defendant argues that Mr. Whitsett's testimony regarding his conversations with other individuals regarding Dr. Murray are hearsay. The Court finds that Mr. Whitsett's testimony as to conversations he has had with other individuals about Dr. Murray are not hearsay, to the extent that Mr. Whitsett bases his subjective belief on these incidents and does not seek to introduce them for the veracity of whether any such incidents actually occurred. Therefore, Defendant's Motion to Strike the affidavit of Mr. Whitsett is denied.

### G. Affidavit of Bahram Zargham ("Zargham")

Similar to the affidavit of Mr. Googerdy, Defendant seeks to strike portions of Bahram Zargham's affidavit and his alleged employment contract, allegedly signed by Dean Monroe,[3] based on hearsay and the fact that Dean Monroe has denied its authorship. The Court finds that Defendant's objections to Mr. Zargham's affidavit and its accompanying exhibit are either without merit or are mere denials and better left to be resolved during trial. As such, Defendant's Motion to Strike the affidavit of Mr. Zargham is denied.

### H. Affidavit of Plaintiff

Defendant objects to Plaintiff's self assessment as a well-established researcher, as well as numerous other statements of job performance. Defendant further objects to Plaintiff relating Dean Monroe's alleged statements to Plaintiff, and objects to various other statements Plaintiff makes as speculation and unsubstantiated. As previously discussed, the Court will give less weight to statements by Plaintiff of

---

**3.** In fact, Defendant's affiant handwriting expert Durward C. Matheny states that it is, in fact, Dean Monroe's signature, but that it was pasted on to the document.

self-assessment. Furthermore, as also previously discussed, statements that Dean Monroe may have made to Plaintiff regarding Dean Monroe's reasons for demoting him are not hearsay. Similarly, statements allegedly made by Dr. Sarin and Ms. Psalmonds to Plaintiff are within the scope of their employment, and as such, are admissible hearsay under Rule 801(d)(2)(D), as statements by a party's agents concerning a matter within the scope of their employment made during the existence of that relationship. As such, Defendant's Motion to Strike portions of Plaintiff's affidavit is denied.

Therefore, Defendant's Motion to Strike Plaintiff's affidavits is denied. To the extent that the Court finds that any particular statement in any of the affidavits does not meet the proper test of Rule 56(e), the Court will not consider that statement in deciding this Motion for Summary Judgment.

## III. DEFENDANT'S EXPERT REPORT

 Defendant seeks to have an expert report which it has obtained with respect to Plaintiff's mental health to be deemed timely served. By his own motion, Plaintiff, on the other hand, seeks to have it excluded as not being timely served. A brief factual background of these motions proceeds an explanation of the Court's reasoning for allowing Defendant's Motion to have the expert's report on Plaintiff's mental health be accepted as timely served.

On March 4, 2004, the parties entered into a Joint Rule 26(f) Report in which the deadline to exchange expert reports was set for Plaintiff at June 15, 2004, and for Defendant at July 15, 2004. Pursuant to this report, Plaintiff timely submitted the expert report of Dr. Robert Dickinson, and consequently, Defendant was permitted to take the deposition of Dr. Dickinson on

November 2, 2004. After Plaintiff served Dr. Dickinson's report, Defendant filed a Motion for a Mental Examination of Plaintiff [Document # 19], under Rule 35 of the Federal Rules of Civil Procedure. Defendant's Motion also asked for an extension of time to serve its expert reports by one month. Plaintiff responded by filing a Motion for a Protective Order [Document # 21]. Plaintiff's Motion, among other concerns, asked for the examination to take place over one day. U.S. Magistrate Judge Sharpe entered an Order on July 13, 2004, extending the deadline for service of Defendant's Expert Report to 30 days from the date of entry of the court's decision on the Rule 35 Motion. On September 29, 2004, Magistrate Judge Sharpe entered an Order on the Rule 35 Motion and limited the time of the examination to one day. As a result, based on the language drafted by Defendant, Defendant's expert report became due by October 29, 2004. Defendant then gave Plaintiff a choice of four days in which to submit to the examination, October 1, 5, 8, and 14. Plaintiff chose October 14, 2004, and the examination did take place on that day. On November 12, 2004, fourteen days after the deadline imposed by Magistrate Judge Sharpe, Defendant served the expert report on Plaintiff. Plaintiff's attorneys admit to receiving the expert report at their offices on November 15, 2004. General discovery ended in this case on November 29, 2004. During the time period between November 15th and November 29th, Plaintiff did not attempt to depose Defendant's expert. Instead, Plaintiff filed a motion on November 29 to exclude the expert report as untimely.

Defendant argues that Plaintiff should be blamed for all the delay over the expert report, because Plaintiff filed a Motion for a protective order and later chose the latest date possible for his mental examina-

tion to take place. Defendant notes that Plaintiff knew the name of its expert in early August, and that Plaintiff was also aware, based on Defendant's Rule 35 motion, that Defendant anticipated it would take the expert five weeks to prepare the report. Finally, Defendant asserted that in its Motion to have the expert report deemed timely served, that it would not oppose an extension of the discovery period for the sole purpose of accommodating a deposition of its expert.

In response, however, Plaintiff argues that Defendant purposefully held on to the expert report for as long a period of time as possible, thereby depriving Plaintiff of the opportunity to conduct meaningful discovery or question the theories or results surrounding Defendant's expert's findings. Plaintiff cites to *Southern States Rack & Fixture, Inc. v. Sherwin–Williams Co.,* 318 F.3d 592, 596 (4th Cir.2003), for five factors that the Fourth Circuit has looked to when determining whether a failure to timely submit an expert report amounts to substantial justification or harmless error: (1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before the trial; and (5) the importance of the testimony. In *Southern States,* the court refused to allow the introduction of the expert testimony at trial, even though the opposing party knew the expert's identity and knew what the expert would testify to, because the expert's theory had not been disclosed to the opposing party in the time frame provided by the court. However, in *Southern States,* the expert opinion was not provided to the opposing party until the week the trial started. *Southern States,* 318 F.3d at 594–95.

In this case, Plaintiff was provided with Defendant's expert opinion two weeks prior to the close of discovery, and more than twenty weeks prior to trial. Therefore, Plaintiff cannot meet the *Southern States* test, as Plaintiff cannot plausibly claim surprise, and Plaintiff failed to make any effort to cure any surprise that did exist by using the two remaining weeks of discovery or by accepting Defendant's offer to extend discovery or to allow the expert's deposition to be taken outside of the discovery period. Allowing the testimony of Defendant's expert should not disrupt the trial. Defendant disclosed the name of its expert early into the process, relating to its Rule 35 motion. Defendant's expert's testimony is important because it could impact Plaintiff's damages. The Court finds that, taking these facts together, (and excusing both Defendant's attempts to blame Plaintiff for all delay by seeking a protective order and Defendant's refusal to accept responsibility for setting its own deadline to serve the expert report) Defendant's Motion to have its Expert Report Deemed Timely Served will be granted, and Plaintiff's Motion to have Defendant's Expert Report Excluded will be denied.

## IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). There can be "no genuine issue as to any material fact" if the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case," since "a complete failure of proof concern-

ing an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. As a result, the Court will only enter summary judgment in favor of the moving party when " 'the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the [nonmoving] party cannot prevail under any circumstances.' " *Campbell v. Hewitt, Coleman & Assocs.,* 21 F.3d 52, 55 (4th Cir.1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.,* 381 F.2d 245, 249 (4th Cir.1967)).

When ruling on a summary judgment motion, the Court "view[s] the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences." *Bailey v. Blue Cross & Blue Shield,* 67 F.3d 53, 56 (4th Cir.1995). The moving party bears the initial "burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law." *Catawba Indian Tribe v. South Carolina,* 978 F.2d 1334, 1339 (4th Cir.1992) (en banc). Once the moving party has met this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* In so doing, the nonmoving party may not rest on mere allegations, denials, or unsupported assertions, but must, through affidavits or otherwise, provide evidence of a genuine dispute. *Anderson,* 477 U.S. at

248–49, 106 S.Ct. at 2510; *Catawba Indian Tribe,* 978 F.2d at 1339. In other words, the nonmoving party must show "more than ... some metaphysical doubt as to the material facts," for the mere existence of a scintilla of evidence in support of its position is insufficient to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Catawba Indian Tribe,* 978 F.2d at 1339.

In addition, "[w]hile courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 958–59 (4th Cir.1996).

Based on this standard, the Court will now consider in turn the two claims brought by Plaintiff which are properly before the Court: (1) national origin and religion discrimination in violation of Title VII based on Defendant's demotion of Plaintiff;[4] and (2) retaliation in violation of Title VII based on Plaintiff filing a claim with the EEOC.

### A. Discrimination Based on National Origin and Religion

Under Title VII, it is an "unlawful employment practice for an employer ... to discriminate against any individual ..., because of ... religion ... or national origin." 42 U.S.C. § 2000e–2(a)(1). To establish a discrimination claim, a plaintiff may rely on direct evidence, indirect evidence, or a combination of both direct and

---

4. Plaintiff also alleges retaliation based on his support of Title VII in his first EEOC complaint. Because Plaintiff has failed to present any evidence on this issue, the Court finds that Plaintiff has failed to present evidence to establish a prima facie case of retaliation based on his support for Title VII, and so Plaintiff's claim fails as a matter of law, based upon a retaliation claim in violation of Title VII.

indirect evidence. *See, e.g., Desert Palace, Inc. v. Costa,* 539 U.S. 90, 99–101, 123 S.Ct. 2148, 2154–55, 156 L.Ed.2d 84 (2003). Regardless of the type of evidence offered, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 286 (4th Cir.2004).

In this case, Plaintiff relies on the judicially created scheme of proof originally established for use in Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). That scheme requires that Plaintiff prove, by a preponderance of the evidence, a prima facie case of discrimination. *Hill,* 354 F.3d at 285. To demonstrate a prima facie case of discrimination under Title VII, a plaintiff must show that (1) he is a member of a protected class, (2) an adverse employment action, (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action, and (4) the job remained open or was filled by a similarly qualified applicant outside of Plaintiff's class. *See McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824. Once Plaintiff has established his prima facie case, Defendant must respond with evidence that it acted with a legitimate, nondiscriminatory purpose. *Id.* If

Defendant meets this burden of production, the presumption of discrimination created by the prima facie case vanishes, requiring Plaintiff to prove that Defendant's proffered reason is a pretext for discrimination in order to recover. *Id.* at 804, 93 S.Ct. at 1825.[5]

Defendant argues that Plaintiff cannot meet the first burden, that of proving a prima facie case, for three primary reasons. First, Defendant argues that Plaintiff did not suffer an adverse employment action. Second, Defendant argues that Plaintiff cannot show that he was performing as associate dean at a level which met Dean Monroe's expectations. Third, Defendant argues that Plaintiff was replaced by another person of foreign origin, and so Plaintiff cannot show that he was replaced by a person outside of his protected class. The Court will now discuss each of these contentions in turn.

■ First, Defendant argues that Plaintiff cannot establish an adverse employment action. An adverse employment action is an action which results in a "significant detrimental effect" to the employee. *See Boone v. Goldin,* 178 F.3d 253, 256 (4th Cir.1999). An adverse employment action may include a decrease in compensation, job title, level of responsibility, or opportunity for promotion. *See James v. Booz–Allen & Hamilton, Inc.,* 368 F.3d 371, 376 (4th Cir.2004). However, "[t]he mere fact that a new job assign-

---

5. In light of *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), Plaintiff is no longer required to show pretext *plus* some additional evidence of discrimination. *Id.* at 148, 120 S.Ct. at 2109. In other words, the Court may infer the ultimate fact of discrimination merely from the falsity of Defendant's proffered explanation. *Rowe v. Marley Co.,* 233 F.3d 825, 830 (4th Cir.2000). In addition, under the Supreme Court's holding in *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), Plaintiff may instead offer evidence to support a finding that Defendant's reason, "while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir.2004) (citing *Rishel v. Nationwide Mut. Ins. Co.,* 297 F.Supp.2d 854, 865 (M.D.N.C.2003)). Nevertheless, Plaintiff, at all times, bears the ultimate burden of persuasion with respect to Defendant's alleged unlawful national origin and religion discrimination.

ment is less appealing to the employee ... does not constitute an adverse employment action." *Id.* Defendant relies on the case of *Mitchell v. Vanderbilt University,* 389 F.3d 177 (6th Cir.2004), in which the court decided that a tenured professor did not suffer an adverse employment action where he was removed from his position as medical director of pathology services, his grant applications were subject to forced review, and his research space was reduced. *Id.* at 182–83. Defendant's reliance is misplaced. *Mitchell* is easily distinguished from the present case, as in *Mitchell,* the court notes that the university's proposals to reduce Mitchell's pay and alter his employment status were never implemented. *Id.* at 182. In the instant case, Plaintiff alleges that he was actually demoted from associate dean to a mere faculty position, which in turn decreased his salary, provided him with fewer administrative responsibilities, and hindered his ability to advance within Defendant and elsewhere. As such, the facts here are distinguishable from *Mitchell* and the Court therefore finds that Plaintiff has established that he suffered an adverse employment action.

■ Second, Defendant argues that Plaintiff cannot prove that he was performing up to Dean Monroe's expectations. Plaintiff argues that genuine issues of material fact exist over whether Plaintiff was adequately performing. For example, at the time that Dean Monroe demoted Plaintiff, he gave Plaintiff a letter that thanked him for his "diligent and useful services performed" and was not told that he was being demoted "for cause." [6] During Dean Monroe's deposition testimony, he admitted that in December 2001, the date when Plaintiff was demoted, he thought Plaintiff was doing a good job. (Dep. Monroe, at 129–30.) Plaintiff states in his affidavit that when he met with Dean Monroe on December 7, 2001—five days prior to the demotion meeting—to discuss Plaintiff's job performance, Dean Monroe told him he was doing excellent work as associate dean and had no negative comments regarding Plaintiff's performance. (Aff. Salami, at ¶ 25.) Additionally, Dean Monroe never did a written evaluation of Plaintiff, admittedly in contravention of Defendant's policy. (Dep. Monroe, at 124.)

Dean Monroe denies that the conversation on December 7, 2001 took place as Plaintiff alleges. Dean Monroe also contends that the actual reason he demoted Plaintiff was a sudden desire to reorganize the department, stemming from Plaintiff's refusal to make a change in who graduate students should look to within the COE for tuition and other care. (Dep. Monroe, at 131.) Additionally, Defendant now argues that Plaintiff's work in the accreditation process, his failure to accurately administer Title III money, and his relations with his peers at the university were all reasons that Dean Monroe demoted Plaintiff. (Def.'s Mot. Summ. Judg., at 7.)

Plaintiff also disputes these additional reasons that Defendant has now alleged.

---

**6.** Plaintiff argues that he had an employment contract with Defendant, as evidenced by the salary letter he received from Chancellor Renick that states that his salary over the "contract period" would be $99,672. Plaintiff further argues that because he had such a contract, he could only be fired, according to Defendant's personnel policies, "for cause." Defendant argues, however, that Plaintiff was an at-will employee, and that as an at-will employee, Dean Monroe could demote Plaintiff either for cause or by "discontinuation with notice," which does not require performance grounds. In this case, Dean Monroe chose discontinuation with notice. As it is unnecessary to the disposition of this case, the Court will not reach the question of whether Plaintiff was an at-will or contract employee.

Plaintiff argues that as for the accreditation process, he was only assigned the task of facilities preparation. Plaintiff contends that for his efforts in this regard, he received a commendation from Provost Meyers. Additionally, Dean Monroe admits in his deposition that he was satisfied with Plaintiff's work in this area. (Dep. Monroe, at 73.) As for the Title III money, Plaintiff argues that his actions were directly supervised by both Dean Monroe and Dr. Murray. After the site visit, Plaintiff states that Dr. Murray had him removed from administering the Title III money with Dean Monroe's approval, even though Dr. Murray was later himself removed from handling the Title III money. (Aff.Salami, ¶ 23.) Finally, as for Plaintiff's interactions with his peers, Plaintiff notes that Dean Monroe provides little specificity for this opinion, except for admitting that Dr. Murray had told him that it was "very difficult, if not impossible," to continue to work with Plaintiff. (Dep. Monroe, at 137.) The Court finds that, given that all factual inferences must be determined in favor of the non-moving party, Plaintiff has adequately established that he was performing up to Dean Monroe's expectations as associate dean and Defendant has not shown by a preponderance of the evidence that Plaintiff was not so performing.

■ Third, Defendant argues that Plaintiff cannot show that he was replaced by an individual outside of his class as Plaintiff was replaced by another "person of foreign origin." (Def.'s Reply on Def.'s Mot. Summ. J., at 1.) Defendant errs in defining such a broad class of persons as eligible to defeat Defendant's prima facie case. An employer may well discriminate against members of some national origin, but not discriminate against another group of foreign nationals. *See Hassan v. Auburn Univ.*, 833 F.Supp. 866, 870 (M.D.Ala.1993)(finding an Egyptian national not in the same class as a Canadian national of Turkish descent). "The mere fact that the successful applicant is within the protected group of foreign nationals, therefore, does not preclude [p]laintiff from establishing his prima facie case ..." *Id.* The Court now finds that particularly after such a polarizing event as the devastating attacks on September 11, 2001, it is not unreasonable to suspect that an Iranian and Muslim individual may have been treated differently by an employer than an individual who is Indian and Hindu. Thus, the Court finds that Plaintiff has shown a prima facie case in all respects.

■ After a prima facie case is proven, Defendant must then state a legitimate, non-discriminatory reason for Plaintiff's demotion. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824. Defendant has done so, as previously discussed, by stating that the reason for Plaintiff's demotion was Dean Monroe's desire to reorganize the COE, as well as Dean Monroe's opinion of Plaintiff concerning the accreditation process, the Title III money, and his interactions with his peers. As such, the burden returns to Plaintiff to prove by a preponderance of the evidence that Defendant's stated reasons "were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). "The fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). Furthermore, evidence used by Plaintiff to establish his prima facie case and any inferences properly drawn

from that evidence may still be considered on the issue of whether Defendant's explanation is pretextual. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

In this case, the evidence supporting Defendant's explanation for the demotion consists primarily of Dean Monroe's affidavit. Dean Monroe testifies that Plaintiff's national origin and religion played no part in his decision making as to Plaintiff's employment. Dean Monroe denies that Dr. Murray or Provost Meyers instructed him to demote Plaintiff. Defendant argues that this Court must find a "powerful inference" that because Dean Monroe "technically hired" Plaintiff when he became Dean in 2000, a subsequent demotion within a short time could not have been motivated by discriminatory intent. (Def. Mot. Summ. Judg., at 8.) For this proposition, Defendant cites to *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991)("Therefore, in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span ... a strong inference exists that discrimination was not a determining factor ..."). However, *Proud* can be distinguished from the instant case. First, in *Proud* the hiring and firing took place over a six-month time frame, rather than the 18 months alleged by Plaintiff. Second, and more importantly, during the time period, and more particularly, close to the end of the time period, Plaintiff can point to a discrete event, September 11, 2001, that may have influenced Dean Monroe's opinion of Plaintiff based on his national origin and religion. There is no such factual basis in *Proud.* As the Fourth Circuit stated in *Proud,* "we can imagine egre-

gious facts from which a discharge in this context could still be proven to have been discriminatory ...". *Id.* at 798.

Defendant also points to the fact that since Dean Monroe became Dean, he has hired individuals from all over the globe, including Iranians. Defendant states that Dean Monroe hired Iranians prior to September 11, 2001, and then again in September 2003 (Dr. Abdollah Homaifar and Dr. Mohammad Zolghadri) and May 2004 (Abolghasem Shahbazi). However, the two Iranians that Dean Monroe points to that he hired or promoted prior to September 11, 2001, Dr. Johangir Emrani and Dr. Ashgar Googerdy, were both terminated [7] by Dean Monroe in 2002, along with another Iranian, Bahram Zargham. The Court finds that evidence that Dean Monroe resumed hiring Iranians in 2003 does not necessarily preclude the inference that Dean Monroe suffered a discriminatory animus during the time period of 2001–2002.

Defendant also argues that Dean Monroe's decision-making as to Plaintiff has been consistent, and even if not, that the same skills have consistently been highlighted and preferred by Dean Monroe, and upon discovering the extent to which Plaintiff lacked such skills and the capacity to improve, Dean Monroe decided to change his associate dean. Defendant cites to the unpublished Fourth Circuit case of *Newsom v. Barnhart,* No. 03–2034, 2004 WL 2617772 (4th Cir. Nov.18, 2004) for the proposition that a hiring manager's explanation, when he initially stated that he hired the best individual for the job, but later stated that the passed-over employee lacked personal skills, was not a "post-hoc rationale." *Id.* at *4. Unpublished opinions are not favored in this

---

7. Defendant contends that each of these individuals were terminated for a different rea-

son, none of them discriminatory.

Court and are not binding precedent. Local R.App. Pro. 36(c). However, *Newsom* can be distinguished from the instant case. Plaintiff argues that Defendant has given many different versions of why Plaintiff was demoted. Plaintiff states that in his letter of demotion, Dean Monroe thanked him for his "diligent and useful services" performed, and did not mention any poor performance. Plaintiff further states that during the demotion conversation, Dean Monroe told him that the main reason for his demotion was that Dr. Murray could not work with him, not that Dean Monroe truly desired to reorganize the COE. Plaintiff contends that it was not until this lawsuit was filed that Dean Monroe began to make assertions that Plaintiff failed in his interactions with his peers, that he failed to accurately administer the Title III money, and that he failed to properly prepare an accreditation report. However, as previously noted, Dean Monroe stated in his deposition that Plaintiff was doing good work as associate dean in December 2001. Furthermore, while Dean Monroe now states that he was unhappy with a draft report by Plaintiff as to the accreditation process—which then led Dean Monroe to reassign Plaintiff to handling only the cleaning of the physical facilities for the accreditation process— Plaintiff denies in his affidavit that he was ever asked to write any such report. Finally, as for Dean Monroe's initial stated reason for the demotion, the reorganization of the COE, the Court finds that Dean Monroe's deposition testimony tends to contradict even this explanation, in that Dean Monroe cannot remember when he decided to reorganize and eventually admits that the only reason for the reorganization was to remove Plaintiff from his position. (Dep. Monroe, at 137.) The Court finds that this case is more like *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846 (4th Cir.2001), than like *Newsom*. In

*Sears Roebuck,* the Fourth Circuit held that post-hoc rationalizations could be used as evidence of pretext. *Id.* at 852–53 ("Indeed, the fact that Sears has offered different justifications at different times for its failure to hire Santana is, in and of itself, probative of pretext.") Therefore, this Court now finds that Plaintiff has made a showing that Defendant's explanation is likely false based on its own inconsistencies.

Additionally, while not absolutely necessary under *Reeves v. Sanderson Plumbing Products, Inc.*, which held that a plaintiff in an employment discrimination context need not prove pretext *plus* a discriminatory animus, Plaintiff has evidence that could show a discriminatory animus on the part of Dean Monroe. Plaintiff alleges that Dean Monroe relied heavily on Dr. Murray's opinion of Plaintiff when making the demotion decision. While Dean Monroe denies making such a statement to Plaintiff, Dean Monroe does admit in his deposition that "Murray felt it was very, very difficult, if not impossible, for him to continue to work with Salami." (Dep. Monroe, at 137.) While any evidence that Dr. Murray's alleged racist attitudes influenced Dean Monroe's decision would not be enough, on its own, absent a showing that Dean Monroe himself held a discriminatory animus against Plaintiff, to hold A & T liable for employment discrimination, *see Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir.2004), that fact of Dr. Murray's influence on Dean Monroe, taken together with the terminations of three other Iranians in 2002 by Dean Monroe, could be enough to show intentional discrimination on the part of Dean Monroe against Iranians. Defendant argues that it had reasons to terminate the three Iranians. However, two of the three Iranians that were terminated have stated in affidavits that they had

employment contracts with Defendant that were not honored by Dean Monroe, and that they know of no other reason for their terminations except for national origin discrimination. Based on this evidence, and taking the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Defendant's explanation for its employment decision as to Plaintiff was discriminatory. While the Court makes no determination that there was, in fact, any discrimination, the Court will conclude that there is sufficient evidence to allow a jury to make a decision as to whether Defendant harbored discriminatory animus as to the national origin and religion of Plaintiff. Thus, the Court will deny Defendant's Motion for Summary Judgment as to national origin and religion.[8]

### B. Retaliation

Plaintiff also brings a claim of retaliation against Defendant, which Plaintiff asserts that Defendant engaged in based on Plaintiff's filing of both the first and second EEOC charges. Under Section 704 of Title VII, "it shall be an unlawful employment practice for an employer to discriminate against any of his employees .... because [the employee] has made a charge ... under this subchapter." 42 U.S.C. § 2000e–3. Plaintiff argues that Defendant retaliated against him by stopping renovations on his research facilities; by ordering him to stop using the name CIRI on his research proposals; by failing to approve the PTIA Proposal; and by failing to disburse money from the Caterpillar proposal.[9] Defendant argues that this Court should not consider Plaintiff's retaliation claim as it relates to the Caterpillar money because it was not specifically alleged as part of Plaintiff's EEOC charge. Defendant further argues that Plaintiff cannot make out a prima facie case of retaliation, and even if he can, that Plaintiff cannot show that Defendant's non-discriminatory explanations are pretextual. Thus, the Court will first discuss the scope of Plaintiff's retaliation claims, and then will discuss the general legal standards that would apply to all of Plaintiff's retaliation claims. The Court will finally discuss the merits of each of Plaintiff's retaliation claims.

### 1. Scope of the Claim

 Only discrimination claims that are "stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir.1996). However, courts have consistently held that *retaliation* claims may be raised for the first time in federal court if the retaliation occurred after the filing of the administrative charge. *See McKenzie v. Illinois DOT*, 92 F.3d 473, 482 (7th

---

8. While Plaintiff has presented negligible evidence that any discriminatory animus was based upon his religion, the Court is convinced by the reasoning in *Sasannejad v. University of Rochester*, 329 F.Supp.2d 385 (W.D.N.Y.2004), in which the court found that while a claim based on national origin discrimination is theoretically different from a claim based on religious discrimination, in certain circumstances, the two claims "may be so interrelated as to be indistinguishable." *Id.* at 391. The court stated this in a case involving an Iranian who was also a Muslim,

and noted that "Iran is an Islamic Republic and ninety-eight percent of its population is Muslim." *Id.*

9. Plaintiff states that additional evidence of retaliation includes Defendant's failure to reimburse him for certain travel expenses, Plaintiff's removal from Defendant's Faculty and Tenure Promotion Committee, and recent negative teaching reviews. (Aff.Salami, ¶¶ 59–60.)

Cir.1996)(holding that alleged retaliatory actions that occurred after the filing of the EEOC charge could be brought in federal court, but that alleged retaliatory actions that occurred prior to the filing of the EEOC charge should have been included in the administrative charge and could not serve as the basis of the retaliation claim); *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir.1992).

 In this case, Plaintiff timely filed an EEOC complaint alleging retaliation based on A & T's denial of funding to renovate lab space used for the CIRI, and based on the university's failure to "assist[ ] with the procurement of research funds for the Institute, in particular funds from the FAA." Based on a review of Plaintiff's second EEOC charge, the Court finds that Plaintiff's EEOC complaint clearly asserted claims of discrimination on the bases of national origin, religion, and retaliation. The EEOC retaliation complaint therefore clearly covered Plaintiff's request for renovations to his lab space, as well as the alleged refusal by A & T to approve Plaintiff's project to seek funding from the FAA for the PTIA Proposal.

Defendant nevertheless contends that Plaintiff's assertion of A & T's failure to provide him with funding from the Caterpillar proposal was not asserted in his EEOC charge and so should not be considered by this Court as an incident of retaliation. Following the rule in *Nealon,* any of the incidents that occurred after Plaintiff filed his second EEOC retaliation charge can be considered by the Court as further incidents of retaliation by A & T. *Nealon,* 958 F.2d at 590 ("Having once been retaliated against for filing an administrative charge, the plaintiff will naturally be gun shy about inviting further retaliation by filing a second charge complaining about the first retaliation … [W]e [therefore] join the other circuits that have spoken to the question in adopting the rule that a separate administrative charge is not a prerequisite to a suit complaining about retaliation for filing the first charge.") (citation omitted).

Therefore, given that Plaintiff filed his second EEOC Complaint, No. 145A300053, on October 31, 2002, and Plaintiff has further alleged that Defendant denied him funding from the Caterpillar Proposal in the fall of 2003, the Court finds that Plaintiff's claim of denial of funding in this instance is reasonably related to Plaintiff's second EEOC charge alleging retaliation based on the university failing to assist with "the procurement of research funds for the Institute." As such, the Court finds that the retaliation charge of denying Plaintiff funding from the Caterpillar Proposal can be properly considered by this Court.[10]

### 2. General Legal Standards That Apply to Retaliation Claims

The legal standard for determining whether retaliation has occurred is similar to that of determining whether employment discrimination has occurred. "A plaintiff lacking direct evidence of retaliation may utilize the *McDonnell Douglas* … framework to prove a claim of retaliation." *Price v. Thompson,* 380 F.3d 209, 212 (4th Cir.2004). To establish a prima facie case of retaliation, an employee must show: (1) that the employee engaged in protected activity; (2) that the employer took adverse employment action against the employee; and (3) a causal connection

10. Defendant makes a similar argument in its Reply on Defendant's Motion for Summary Judgment that the removal of Plaintiff's research space was not included in either of Plaintiff's EEOC charges, and so should not be considered by this Court. However, the Court finds that argument to be similarly without merit, as it is an incident of retaliation that occurred after Plaintiff filed his second EEOC charge.

existed between the protected activity and the adverse action. *Id.; Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 443 (4th Cir.1998). Once a prima facie case has been presented, the employer has the burden of producing a legitimate non-retaliatory reason for the adverse action, and the plaintiff must then show that the employer's proffered reasons are pretextual. *Price,* 380 F.3d at 212. In the present case, Plaintiff contends that he engaged in a protected activity when he filled an EEOC charge on May 2, 2002, as a result of his demotion, and again on October 31, 2002, as a result of alleged retaliation.

■ Many of Defendant's arguments as to Plaintiff's retaliation claims are that Plaintiff has not alleged an "adverse employment action." An adverse employment action must "alter the terms, conditions, or benefits of employment." *Von Gunten v. Maryland,* 243 F.3d 858, 864 (4th Cir.2001). However, in the retaliation context, the retaliation need not reach the level of hiring, refusing to promote, or discharging, where the alleged retaliatory acts alter the terms, conditions, or benefits of employment. *Id.* at 865. Adverse employment actions also include actions "that would adversely affect one's professional reputation or ability to gain future employment, whether or not there was an ultimate employment decision." *See Howze v. Virginia Polytechnic,* 901 F.Supp. 1091, 1098 (W.D.Va.1995)(finding that university report that became part of plaintiff's employment record and that could hurt plaintiff's professional reputation could constitute an adverse employment action).

### 3. Denial of Renovations and Denial of Research Space as an Act of Retaliation

Plaintiff alleges that prior to filing his EEOC charge, Plaintiff had come to an agreement with A & T for Defendant to provide $250,000 to renovate Graham room # 10. Plaintiff also contends that prior to his EEOC charge, A & T was moving forward with the renovations. As evidence of this favorable action, Plaintiff points to an agreement, dated August 24, 2000, that he drafted but that was signed by Dean Monroe and Paula Jeffries ("Jeffries"), then Interim Vice Chancellor for Business and Finance of A & T.[11] Next to Ms. Jeffries's signature is the handwritten word, "Approved." This agreement asks for "permission to prepare the quotations for renovations and installations of the equipment in the Civil Infrastructure Research Institute (Graham room # 10 and IRC Room # 122)." (Aff.Salami, Ex. M.) This letter further states that "I am formally requesting the allocation of $250,000 for the renovations, installations of equipment and instrumentation, and other necessary items for the [CIRI] to make the CIRI fully operational. I have discussed this matter with Drs. Psalmonds and Meyers. They are supporting this final resolution for CIRI." (*Id.*) However, subsequent to filing the EEOC charge, Plaintiff alleges that all work on the interior of Graham room # 10 stopped. As a result, Plaintiff alleges that he has lost research salary that would have resulted from his use of the renovated space.

Plaintiff points out further that in a letter dated November 29, 2004, Defendant informed him that all of his research space will be taken away, purportedly based on Plaintiff's alleged failure to turn in a response to Defendant's query to all COE professors as to their research space needs. Defendant asserted in several e-mails to Plaintiff that he failed, despite

11. Ms. Jeffries, as interim vice chancellor, was the "chancellor's designee for all the funds and the finance at the University." (Aff. Monroe, at 98.)

repeated efforts to solicit Plaintiff's information, to turn in his form. Plaintiff, however, states in his affidavit that he turned in the form twice, to his supervisor, Dr. Rojecki. As evidence of this, Plaintiff includes a copy of one of the forms he allegedly turned in to Dr. Rojecki as an exhibit. Defendant responds, however, that the copy of the form submitted by Plaintiff is neither signed nor dated.

As to the renovation issue, Defendant argues, first, that loss of research space is not an adverse employment action. For this proposition, Defendant cites to *Von Gunten*, in which the court determined that the defendant was not required to provide plaintiff with a state vehicle as a benefit of employment. *Von Gunten*, 243 F.3d at 867. Second, Defendant argues that even if it is an adverse employment action, Plaintiff's complaints as to research space predate his EEOC charge, and as such, cannot be causally connected to the charge. Third, Defendant argues that Plaintiff cannot show that denial of such funding adversely affected Plaintiff, given that he is still a tenured full professor in the College of Engineering at A & T. For this proposition, Defendant again cites to *Mitchell*, in which the Sixth Circuit Court of Appeals held that a reduction in lab space from 2000 to 150 square feet was not an adverse employment action because plaintiff could point to no evidence suggesting that the reduction in space had a materially adverse effect on his salary or status of employment. *Mitchell*, 389 F.3d at 183 ("While the reduction in laboratory space likely had an initial effect on Mitchell's ability to conduct research, this, without more, does not constitute a materially adverse employment action.").

However, at least one court has found that denial of research space is an adverse employment action. In *Chuang v. University of Cal. Davis*, 225 F.3d 1115 (9th Cir.2000), the court found that a forcible relocation of two scientists that disrupted important, ongoing research projects and caused the loss of research grants that the scientists relied on for a salary was an adverse employment action. *Id.* at 1126. Furthermore, Plaintiff states that his earlier grievances as to research space were resolved by the university's promise to renovate space for his research, which resulted in his seeking the renovation estimates that are listed in his letter that was presented to and approved by Vice Chancellor Jeffries. (Aff.Salami, Ex. M.) Finally, the fact that Plaintiff remains a full tenured professor at A & T does not mean that he cannot show that he has lost research salary as a result of Defendant's failure to renovate the facilities as they had previously promised and approved.

■■■ Assuming without deciding whether failure to renovate the space was an adverse employment action, and assuming that Plaintiff has shown a causal link between his EEOC complaint and Defendant's failure to renovate, this Court nevertheless now finds that Plaintiff has failed to prove pretext on the part of Defendant as to the research renovations. Dean Monroe states in his affidavit that he never considered the letter drafted by Plaintiff to be a formal contract requiring A & T to renovate the space. Indeed, Defendant argues that it is unaware of any specific money that has ever been set aside to renovate Graham room # 10, and more specifically, that any renovations of Graham room # 10 will be subsumed into a larger bond renovation package that has been assigned to renovate the entire Graham building. Additionally, while Plaintiff alleges that all work stopped on Graham room # 10 after he filed his first EEOC charge in May 2002, in fact, no work had been done on the building since the fall of 2000. Therefore, the Court finds that

Plaintiff has made no showing that any of Defendant's non-discriminatory explanations are false with respect to whether Defendant promised Plaintiff to renovate his research space. As such, the Court finds that Plaintiff has failed to show pretext as to the renovation issue.

■ However, the Court finds that Plaintiff has raised a genuine issue of material fact as to the deprivation of all of his research space at A & T, the denial of which was allegedly based on his failure to return a document detailing his space needs to the Defendant. If, in fact, Plaintiff has now been deprived of all his research space, then the Court finds that would be an adverse employment action and Plaintiff has raised a material question of fact as to whether he did, in fact, turn in the requested questionnaire as to his space needs. Therefore, Defendant's Motion for Summary Judgment as to Plaintiff's claim of retaliation based upon the renovation issue is granted, but the Court will deny Defendant's Motion for Summary Judgment as to Plaintiff's claim of retaliation on the basis of Defendant's intent to deny Plaintiff adequate research space.

4. Retaliation Based Upon the Termination of the CIRI

Plaintiff alleges that prior to filing his EEOC charge, Defendant supported his establishment of the CIRI, a research entity to couple student and professor research together. However, after Plaintiff filed his EEOC charge, Defendant began telling Plaintiff to "cease and desist" using the name of the CIRI on proposals, because it was not an official "center" at A & T. Plaintiff alleges that because of Defendant's position on the CIRI, he has been forced to stop pursuing the PTIA Proposal and the Caterpillar Proposal, as those proposals were made in conjunction with the CIRI. Plaintiff has alleged that Defendant's retaliatory acts in this regard caused him to lose salary and professional opportunities.

Defendant, however, argues that A & T never terminated the CIRI, but merely told Plaintiff to stop unilaterally scheduling and marketing events open to the public, by using the names of A & T and the CIRI without A & T's permission. Furthermore, Dean Monroe states in his affidavit that at no point did A & T direct Plaintiff to stop conducting research.

■ Plaintiff argues, and this Court finds, that telling Plaintiff to "cease and desist" from publicly promoting or operating the CIRI could be grounds for an adverse employment action, as it may "adversely affect one's professional reputation or ability to gain future employment." *See Howze*, 901 F.Supp. at 1098; *see also* (Rebut. Aff. Monroe, at 3 ("Being recognized as a small 'c' center or small 'I' institute did not result in any special funding at N.C. A & T, however, the only real benefit was that a faculty member could advertise his research or work as being conducted through such a center or institute")). Because Plaintiff had listed the CIRI name on all of his research proposals, to suddenly require him to stop using the term could adversely affect his ability to seek current and future grant money from outside sources. Furthermore, the Court finds that Plaintiff has raised a material issue of fact as to Defendant's rationale for declaring that the CIRI must not be publicized or operated by Plaintiff. Plaintiff shows that prior to his lawsuit being filed, Defendant supported his operations of the CIRI and provided the CIRI with its own research funding. Defendant argues that it has merely told Plaintiff to stop using the name of the CIRI in scheduling functions until the CIRI is fully established by A & T. However, as of March 30, 2005, Defendant is still advertising the CIRI as an

institute at A & T on its public website. *See* Centers and Institutes, Division of Research North Carolina A & T University, at *http://dor.ncat.edu/under/centers/index.htm; see also* (Dep. Monroe, at 186.) The fact that Defendant is arguing that Plaintiff may not use the CIRI name because it does not exist coupled with the fact that Defendant itself is still using the CIRI name is inconsistent and probative of pretext. As such, the Court finds that Defendant's Motion for Summary Judgment as to retaliation based upon the termination of the CIRI is denied.

### 5. Retaliation Based Upon Defendant's Actions With Regard to the PTIA Proposal

Plaintiff alleges that after his demotion, he continued to pursue his research endeavors. One of those research endeavors was the PTIA Proposal, which he submitted to Defendant's Division of Research in December 2003. This Proposal eventually was submitted to Drs. Rojeski, Sarin, and Dean Monroe for review. Plaintiff alleges that proposal review by these individuals is normally a formality, taking just a few days before it is returned to the researcher. However, in the case of the PTIA Proposal, Dr. Rojeski sent Plaintiff a correspondence, dated December 29, 2003, containing ten issues he had with the proposal, including the valuation of certain software to be provided by a software company, and questions regarding the support of PTIA. Plaintiff alleges that it is not common practice for COE administration to question the value assigned to matching funds, nor the technical aspects of a proposal. Plaintiff then provided to COE administration a letter of support from Ted Johnson, executive director of PTIA, and a letter from the software company showing an itemized accounting of the software's value. Despite these showings, COE administration allegedly continued to question the proposal, and as of May 2004, still had not approved it. Because of these actions, Plaintiff alleges that he stopped pursuing the PTIA Proposal and lost research money and professional opportunity. Plaintiff's witnesses Ms. Waldrum and Mr. Baseghi state in their affidavits that A & T's actions regarding Plaintiff's PTIA Proposal were unusual.

Defendant argues that A & T's actions regarding the PTIA Proposal do not constitute an adverse employment action, because the university's review of the proposal, before submission to the FAA, did not adversely impact a "term, condition, or benefit" of Plaintiff's employment. Defendant cites to *Mitchell* for the proposition that requiring a faculty member to submit all research applications for internal review does not rise to the level of an adverse employment action, but is instead "properly considered good institutional administration." *Mitchell*, 389 F.3d at 182. In this way, Defendant misconstrues *Mitchell*, because there is a difference between a policy requiring internal review of all research applications and a refusal to approve a research application. This Court now finds that failure to approve a research application that could directly lead to a decrease in research salary can be an adverse employment action that affects the terms, benefits, and conditions of employment. However, Plaintiff must still be able to show that Defendant's proffered explanation for the delay is pretext.

■ Defendant argues that Plaintiff failed to respond to the detailed concerns of his department, and that any additional review of Plaintiff's proposal was due to the "atypical nature of Plaintiff's proposal." (Def.'s Mot. Summ. Judg., at 17.) Additionally, Defendant states that Plaintiff's proposal was atypical because it was unsolicited by the FAA and included

cost-sharing of several million dollars, which was not common. Furthermore, Defendant states that any additional delay resulted from Plaintiff's own failure to respond to the concerns of COE administrators. Notwithstanding Defendant's Motion, the Court finds that Plaintiff has raised a material issue of fact as to whether COE administrators retaliated against his filing of an EEOC charge by holding up his PTIA Proposal. As such, Defendant's Motion for Summary Judgment as to retaliation based upon Defendant's actions with regard to the PTIA Proposal is DENIED.

6. Retaliation Based Upon Defendant's Actions on Plaintiff's Caterpillar Proposal

Plaintiff alleges that Defendant retaliated against Plaintiff by failing to disburse money from the Caterpillar Proposal to Plaintiff as promised. Plaintiff alleges that in late 2002, Dr. Psalmonds asked Plaintiff to go to Caterpillar headquarters and assess the feasibility of receiving patent rights from Caterpillar on certain water dredge technology, in addition to $50,000 for patent maintenance. Plaintiff alleges that Dr. Psalmonds and he discussed the possibility that if Plaintiff could get a larger amount of money from Caterpillar, then Defendant would provide matching funds and approve the Caterpillar proposal to work on commercial development of the patents. At Defendant's request, Plaintiff was able to negotiate a $200,000 grant from Caterpillar. Plaintiff alleges that Dr. Psalmonds then agreed, prior to this lawsuit being filed, that Defendant would pay $300,000 in matching funds. However, since that time, and after the lawsuit was filed on September 24, 2003, Plaintiff alleges that Defendant has refused to authorize the Caterpillar Proposal and provide the matching funds. Additionally, Plaintiff asserts that Provost

Carolyn Meyers agreed that Plaintiff would receive the remainder of the Caterpillar funds after the costs of patent maintenance have been paid. In support of this, Plaintiff cites to a letter from Provost Meyers to him, dated May 19, 2003, that states that, "It is my understanding that the University will distribute any remainder, if at all, to you after the maintenance costs are paid and the remainder then becomes available." Plaintiff further states that Dr. Psalmonds did honor a small part of her promise by providing Plaintiff with $30,000 from the Caterpillar funds during the summer of 2003. However, Plaintiff states that Defendant has retaliated against him as a result of his EEOC charge because he has received no further funding and has thereby lost salary and professional opportunity.

In response, Defendant argues that Plaintiff's complaint with respect to funding the Caterpillar Proposal does not constitute an adverse employment action, because this is an administrative matter. Furthermore, Defendant states that Dr. Psalmonds sent Plaintiff to negotiate with Caterpillar after both of his EEOC charges were filed. Therefore, Defendant argues that Plaintiff cannot show that but for his filing of the EEOC charges that he would have been extended any further money from the Caterpillar grant. Furthermore, Dean Monroe's affidavit offers a legitimate, non-pretextual reason for A & T's decision not to extend Plaintiff further money, and that is, based on limited funds, the lack of marketability of the dredge, and Plaintiff's failure to perform adequately during the summer of 2003, that Plaintiff did not deserve any further Caterpillar money.

██ This Court now finds that Plaintiff has raised a material question of fact as to whether Defendant promised him more

money from the Caterpillar Proposal but decided against disbursing money to Plaintiff after he filed this Title VII action. *See* 42 U.S.C.2000e–3 ("It shall be an unlawful employment practice for an employer to discriminate ... because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.") Filing a Title VII discrimination lawsuit, just like filing an EEOC charge, is a protected act under the statute. *Id.* Furthermore, Plaintiff has raised a material question of fact as to whether he was performing adequately during the summer of 2003, and as to why Caterpillar would provide so much additional money to A & T absent an agreement to work on commercializing the patents. (Aff. Salami ¶ 53.) As such, Defendant's Motion for Summary Judgment as to retaliation with respect to the Caterpillar Proposal is denied.

## V. CONCLUSION

For the reasons discussed above, the Court finds that Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. The following claims survive Defendant's Motion: (1) Title VII claims of national origin and religion discrimination; (2) Title VII claims of retaliation based on Plaintiff's allegation that Defendant took away all of Plaintiff's research space, in retaliation for filing his EEOC charges, and retaliation based upon Defendant's termination of the CIRI; Defendant's refusal to approve Plaintiff's PTIA Proposal; and Defendant's refusal to provide Plaintiff with additional funds from the Caterpillar Proposal. For the reasons stated above, Plaintiff's claim of retaliation based on renovations to Graham room # 10 fails.

Additionally, as previously stated, Defendant's Motion to Strike [Document # 65] a number of Plaintiff's supporting affidavits is denied. Finally, Plaintiff's Motion to Exclude Defendant's Expert Report [Document # 40] is denied and Defendant's Motion to deem that same expert report timely filed [Document # 38] is granted.

An Order consistent with this Memorandum Opinion will be filed contemporaneously herewith.